**PLANNED PARENTHOOD ASSOCIATION OF KANSAS CITY, MISSOURI, INC. et al., Plaintiffs,**

v.

**John ASHCROFT et al., Defendants.**

**No. 79 4142 CV C.**

United States District Court,
W. D. Missouri, C. D.

Jan. 23, 1980.

Frank Susman, Susman, Schermer, Rimmel & Parker, St. Louis, Mo., for plaintiffs.

J. Michael Davis, Asst. Atty. Gen., Jefferson City, Mo., for defendants.

## OPINION AND ORDER

ELMO B. HUNTER, District Judge:

This is an action for declaratory and injunctive relief in which plaintiffs challenge the constitutionality of several sections of the 1979 Missouri act relating to the regulation of abortions ("the Act").[1] This Court has jurisdiction under 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3).

Plaintiffs are Planned Parenthood Association of Kansas City, Missouri, Inc., and Reproductive Health Services, not-for-profit Missouri corporations. Plaintiffs maintain and operate out-patient clinics in Kansas City and St. Louis, Missouri, respectively, at which medical services are offered to

---

1. House Committee Substitute for House Bill Nos. 523, 626 and 902, 80th Gen. Ass'y, 1st Reg.Sess. (1979). The full text of the Act is set out in the Appendix.

the public, including first trimester abortions performed by staff physicians and pregnancy-related counseling.

Plaintiff physicians are Allen S. Palmer, D. O., and Naim S. Kassar, M. D. Dr. Palmer is licensed to practice medicine in the State of Missouri and performs first trimester abortions on an out-patient basis, both at the Reproductive Health Services clinic and as part of his private medical practice. Dr. Palmer does not perform abortions after the first trimester of pregnancy, but would do so absent the statutory requirement that post-twelve week abortions be performed only in a hospital. Dr. Kassar is also licensed to practice medicine in the State of Missouri. As a part of his medical practice, Dr. Kassar performs first trimester abortions on an out-patient basis in the Planned Parenthood clinic and in a hospital setting. Dr. Kassar performs post-first trimester abortions in a hospital setting but, under certain conditions, would perform such abortions in an out-patient clinic, absent the statutory requirement that post-twelve week abortions be performed only in a hospital.

Defendants are the Honorable John Ashcroft, Attorney General of the State of Missouri, and Ralph L. Martin, Prosecuting Attorney of Jackson County, Missouri, who is sued both in that capacity and "as representative of the class of all similar Prosecuting Attorneys of the various counties of the State of Missouri."

The Act was passed by the General Assembly of the State of Missouri on June 15, 1979, and signed into law by the Governor on June 29, 1979. An emergency clause caused the Act to be effective immediately upon the Governor's approval.[2] This action was filed on June 30, 1979, and after a hearing, the Court temporarily restrained enforcement of §§ 188.020, .025, .030, .039, .040, .052, .063, and .075, RSMo, as signed into law on June 29, 1979. Defendants consented to renewal and extension of that order pending a determination on the merits. Upon defendants' motion and to maintain the status quo, the temporary restraining order was modified on September 27, 1979, to delete §§ 188.020, .025, and .075, RSMo, from its effect. Full trial on the merits was had on October 15–20, 1979.

## I.

### Standing

Plaintiff physicians have standing to challenge the constitutionality of the sections at issue in this case. *Singleton v. Wulff*, 428 U.S. 106, 98 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Defendants concede that the corporate plaintiffs have standing to challenge § 188.025, the requirement that post-twelve week abortions be performed only in a hospital, and § 188.063, which regulates abortion counseling in "abortion facilities," but assert that the organizations lack standing to litigate the constitutionality of any other of the Act's provisions. In light of the standing of plaintiff physicians, the Court need not reach the issue of the corporate plaintiffs' standing.[3]

## II.

### Abortions to be Performed Only by a Physician

Section 188.020 provides: "No person shall perform or induce an abortion except a physician." Plaintiffs' challenge to this

---

**2.** *Id.*, § A.

**3.** Defendants contend that, excepting §§ 188.025 and 188.063, the Act imposes no obligation or regulation on clinics which offer abortion services but rather is directed at the regulation of physicians who perform abortions. *But see Womens Services, P.C. v. Thone*, 483 F.Supp. 1022 (D.Neb.1979) (abortion clinic has standing based on theory of accessory liability under abortion regulation's criminal sanctions); *Akron Center for Reproductive Health, Inc., v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio

1979); *Baird v. Bellotti*, 393 F.Supp. 847 (D.Mass.1975), *vacated and remanded on other grounds*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). *See also* § 188.075 RSMo ("Any person who contrary to the provisions of [the Act] knowingly . . . aids in the performance of any abortion . . . shall be guilty of a class A misdemeanor . . . ."); § 562.041, RSMo (general criminal accessory liability statute); § 562.056, RSMo (corporate liability statute).

restriction is that it prevents a pregnant woman from inducing or performing an abortion on herself. The constitutional infirmity, argue plaintiffs, is two-fold: (1) the statute violates the pregnant woman's constitutional right to "self-treatment," and (2) the Act's penalty provision [4] mandates accessory criminal liability for the physician who, by prescribing an abortion-inducing medication or other abortifacient for a pregnant woman, would aid or abet a nonphysician (the pregnant woman herself) to perform or induce an abortion in violation of § 188.020.[5]

Plaintiffs do not argue that the legislature intended to include the pregnant woman herself within the limitation imposed by the statute but submit that that "plain wording" of the section does so. Accordingly, the prayed-for relief is "merely . . . a declaration that this Section may not constitutionally apply to women seeking to self-abort or to physicians who assist them in doing so."

The context of the present case makes a determination of the constitutional questions posed by plaintiffs unnecessary. The regulation against abortions performed by nonphysicians has been in effect in the State of Missouri, with substantially similar language, since June 14, 1974.[6] This Court is unaware of any case in which the prohibition on abortion by nonphysicians was ever applied to the pregnant woman herself. The Court has been directed to no decision of the courts of the State of Missouri which interprets the provision in that way. There is nothing in the extensive record in this case which would indicate that the legislature intended to criminalize an act of self-abortion by the pregnant woman herself.[7]

■ This Court is obliged to give the regulation that reasonable interpretation which avoids a danger of constitutional invalidity. *United States v. Harriss*, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989 (1954); *State v. Metropolitan St. Louis Sewer District*, 365 Mo. 1, 275 S.W.2d 225 (En banc 1955). That reading of the section's prohibition of abortions performed by nonphysicians which would include the pregnant woman herself within its ban raises such a serious constitutional question. Accordingly, it is not adopted by the Court. As applied to a nonphysician performing an abortion *on an-*

---

**4.** § 188.075, RSMo.

**5.** Plaintiffs' medical experts testified of their use of the so-called "morning-after pill," high dosage estrogen prescribed within 48–72 hours following intercourse. The effect of the morning-after pill is to prevent nidation (implantation of the fertilized ovum in the uterine wall). Because the morning-after pill works *after* conception, it is an abortifacient. Plaintiff physicians testified that although the doctor prescribes and provides the abortifacient medication, it is the pregnant woman who decides whether to take the drug and who administers the medication to herself. In such a situation, say plaintiffs, the doctor assists the pregnant woman to abort herself. Plaintiffs suggest that the same reasoning also applies to use of the intrauterine device (IUD); that the doctor's insertion of an IUD aids the woman in aborting herself should conception occur. There was also testimony regarding the development of a new abortifacient in the form of a tampon impregnated with prostaglandins, which could be inserted by the woman and have the effect of self-induced abortion. There was no evidence, however, that this abortifacient is presently available.

Defendants argue that because the morning-after pill and, "in nearly all cases," the IUD work prior to development of the embryo, neither constitutes an abortion within the meaning of the Act. However, the Act defines "abortion" as "the intentional destruction of the life of an embryo or fetus in his or her mother's womb *or* the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child." § 188.015.1, RSMo (emphasis added).

**6.** Section 188.020(1), RSMo (Supp.1979) (repealed June 29, 1979; § 188.020 of the 1979 Act was enacted in lieu thereof) provided: "No abortion shall be performed . . . except: (1) By a duly licensed, consenting physician . . . ."

**7.** Section 188.080, RSMo, provides:

Any person who is not a licensed physician as defined in section 188.015 who performs or attempts to perform an abortion *on another* as defined in subdivision (1) of section 188.015, is guilty of a felony . . . . (emphasis added)

This section was enacted as a part of the 1974 act relating to abortion and remained in effect at the time of enactment of the 1979 Act.

*other person*, the statute is not challenged here and is clearly valid. *Connecticut v. Menillo*, 423 U.S. 9, 96 S.Ct. 170, 46 L.Ed.2d 152 (1975).

## III.

### Post-Twelve Week Abortions to be Performed Only in a Hospital

Section 188.025 provides that every abortion performed subsequent to the first twelve weeks of pregnancy shall be performed in a hospital. Both physician plaintiffs testified that, absent statutory prohibition, they would perform post-twelve weeks abortions in an out-patient clinic. Plaintiffs argue that the in-hospital requirement places an undue burden on the abortion decision and on the means of effectuating that decision. Plaintiffs also contend that the requirement does not constitute a reasonable regulation in the interests of maternal health.

In *Roe v. Wade*, 410 U.S. 113, 163, 93 S.Ct. 705, 732, 35 L.Ed.2d 147 (1973), the Supreme Court held that "from and after [approximately the end of the first trimester], a State may regulate the abortion procedure to the extent that the regulation reasonably relates to the preservation and protection of maternal health." An example of a permissible subject of regulation was "the facility in which the procedure is to be performed, that is, whether it must be a hospital or may be a clinic or some other place of less-than-hospital status." In *Doe v. Bolton*, 410 U.S. 179, 195, 93 S.Ct. 739, 749, 35 L.Ed.2d 201 (1973), the Court struck down a requirement that all abortions be performed in an accredited hospital but reserved the authority of a state to adopt such a regulation after the first trimester "so long as those standards legitimately related to the objective the State seeks to accomplish."

In *Wynn v. Scott*, 449 F.Supp. 1302 (N.D. Ill.), *appeal dismissed sub nom. Carey v. Wynn*, 439 U.S. 8, 99 S.Ct. 49, 58 L.Ed.2d 7 (1978), *aff'd*, 599 F.2d 193 (7th Cir. 1979), the district court noted that the Supreme Court "specifically stated" that the state may require post-first trimester abortions be performed only in hospitals. The court upheld as rationally related to maternal health a regulation which required post-first trimester abortions be performed on an in-patient basis in a hospital equipped with life-support equipment for the fetus if there is any "clearly visible evidence" of viability. In that case, the court noted, 449 F.Supp. at 1318:

> The methods of performing abortions after the first trimester are relatively complicated. Injection of saline or prostaglandins into the amniotic sac, and hysterotomies take time and require controlled conditions.

Plaintiffs urge that the record before this Court is significantly different from that before the district court in *Wynn*; that the advancement of medical knowledge renders the reasoning of *Wynn* inapplicable.

The controversy over Missouri's in-hospital requirement centers on the abortion technique known as dilatation and evacuation (D & E).[8] This post-first trimester abortion technique was relatively unknown at the time of the 1973 Supreme Court decisions in *Roe* and *Doe* but has come to be a common procedure for the termination of pregnancies of longer than twelve weeks gestation.[9] Plaintiff physicians state that D & E is currently the safest post-first trimester abortion technique up to eighteen weeks gestation and that absent the statutory prohibition they would perform post-first trimester abortions using the D & E method in clinics on an out-patient basis.

---

**8.** Plaintiffs concede that post-first trimester abortion techniques other than D & E, including saline instillation, prostaglandins, hysterotomy and hysterectomy, should be performed only in a hospital.

**9.** In 1977, 73.3% of reported abortions at 13–15 weeks gestation were done by D & E. Of all reported post-12 week abortions, 38.6% were done by D & E. Utilization of other methods for post-12 week abortions in 1977 was as follows: saline instillation, 38.3%; prostaglandins, 16.5%; hysterotomy, 0.4%; hysterectomy, 0.5%; other and unknown, 5.6%. Center for Disease Control, U.S.Dep't of H.E.W., *Abortion Surveillance 1977*, Table 18.

Plaintiffs' medical experts testified that, consistent with good medical practice, post-first trimester abortions can be done safely in an out-patient clinic, at least up to eighteen weeks gestation. Defendants' experts testified that all post-first trimester abortions, regardless of technique employed, should be performed in a hospital because of the increasing risk accompanying later abortions and the ability of a hospital to better deal with potential complications.[10]

In *Planned Parenthood v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976), the Supreme Court held that a Missouri statutory prohibition on the use of saline instillation as a post-twelve abortion technique failed as a reasonable regulation for the protection of maternal health.

> The State, . . .. would prohibit the use of a method which the record shows is the one most commonly used nationally by physicians after the first trimester and which is safer, with respect to maternal mortality, than even continuation of the pregnancy until normal childbirth. Moreover, as a practical matter, it forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed.

*Id.*, at 78–79, 96 S.Ct. at 2845. The Court found that the *existence* of prostaglandins instillation, an alternative technique actually safer than saline, did not justify the ban on saline. The prostaglandins alternative was at that time limited to experimental use and, as a practical matter, was unavailable in the State of Missouri.[11] The prohibition of the saline technique was therefore "an unreasonable or arbitrary regulation designed to inhibit, and having the effect of inhibiting, the vest majority of abortions after the first twelve weeks." *Id.*, at 79, 96 S.Ct. at 2845.

On the record before it, this Court is convinced that aside from the question whether it is performed in a hospital or in an out-patient clinic,[12] dilatation and evacuation is the safest of the presently available post-twelve week abortion techniques.[13] However, the record also indicates that post-twelve week D & E procedures are performed at only one hospital in the State of Missouri.[14] Thus, the requirement that all post-twelve week abortions be performed in a hospital has the practical effect of making a D & E procedure, the safest post-twelve week technique, an alternative which is simply unavailable to many pregnant women in Missouri. Under the reasoning of the Supreme Court in *Danforth*, the state's limitation of post-twelve week abortions to hospitals cannot stand as a reasonable regulation for the protection of maternal health. The effect of the regulation is to make unavailable the most commonly utilized and the safest post-twelve

---

**10.** Defendants' experts testified that a hospital would be equipped with life support systems, an intensive care unit, and a blood bank, and would have the services of an expert anesthesiologist, all of which would be unavailable at a free-standing out-patient clinic. Plaintiffs argue that the emergency room resources of nearby hospitals would be available in case of complications resulting from abortions performed at out-patient clinics.

**11.** "Such an experimental and limited use of prostaglandin throughout the country does not make it available or accessible to concerned persons in Missouri." *Planned Parenthood v. Danforth, supra,* at 77 n.12, 96 S.Ct. at 2845.

**12.** Dr. Bernard Nathanson, one of defendants' experts, testified that the morality and morbidity rates for D & E procedures performed outside a hospital were probably no different than those performed in a hospital.

**13.** Mortality rates (per 100,000 cases) for post-12 week abortion techniques for the years 1972–1977 are as follows:

| | |
|---|---|
| D & E | 8.3 |
| Prostaglandins and other agents | 10.8 |
| Saline instillation | 15.5 |
| Hysterotomy and hysterectomy | 45.3 |

Center for Disease Control, U.S.Dep't of H.E.W., *Abortion Surveillance 1977*, Table 23.

**14.** The uncontroverted testimony of Dr. Naim Kassar was that the Truman Medical Center in Kansas City is the only hospital in the State of Missouri which permits post-12 week abortions by D & E. *Cf. Poelker v. Doe*, 432 U.S. 519, 97 S.Ct. 2391, 53 L.Ed.2d 528 (1977) (a state or city may constitutionally close public hospitals to *all* nontherapeutic abortions).

week abortion technique. As a practical matter, it may force a woman and her doctor to terminate her pregnancy by a method more dangerous to her health than the method made unavailable. The limited availability of the D & E procedure in a single hospital on the western boundary of the state does not convince the Court that D & E is an accessible or meaningful alternative to large numbers of pregnant women in Missouri, particularly those in rural areas or in the metropolitan St. Louis area on Missouri's eastern border. *See Planned Parenthood v. Danforth, supra*, 428 U.S. at 77 n. 12, 96 S.Ct. 2831.

Missouri's in-hospital requirement for all post-twelve week abortions fails for another reason. In *Planned Parenthood v. Danforth,* the Supreme Court held that the state may not grant a third party, in that case the parents of an unmarried woman under the age of eighteen, an absolute veto over the decision of the physician and his patient to terminate the patient's pregnancy. 428 U.S. at 74–75, 96 S.Ct. 2831. *See also Bellotti v. Baird (Bellotti II),* 443 U.S. 622, 639, 99 S.Ct. 3035, 3046, 61 L.Ed.2d 797, 818 (1979). The record before this Court indicates that there is no hospital in the State of Missouri which will admit a woman under the age of eighteen without parental consent.[15] The statute's effect is to impose an absolute parental consent requirement for women under the age of eighteen who desire to terminate pregnancies of longer than twelve weeks gestation. The in-hospital requirement gives the parents of a woman under eighteen who desires a post-twelve week abortion the "absolute, and possibly arbitrary, veto" outlawed by the Supreme Court in *Danforth* and therefore cannot stand.[16]

### IV.

### *Consent for Minors*

Section 188.028 provides a special procedure to obtain or provide consent for an abortion in the case of a pregnant woman under the age of eighteen. Unless a minor is "emancipated," in order for her to obtain an abortion she must secure the consent of one parent or guardian, she must have been granted by court order the right to self-consent, or she must have been granted judicial consent to the abortion. The statute sets out a procedure whereby the minor may seek either the right to self-consent or judicial consent. It provides for the filing of an application in the juvenile court by the minor or her next friend and specifies necessary allegations, including the initials of the minor and the names and addresses of her parents, guardian, or person standing in loco parentis. The minor's parents, guardian or person standing in loco parentis are then to be served with copies of the petition and notice of the time and place of the hearing on the minor's application. There is provision for constructive notice by certified mail if service is not had within two days. The Court may appoint a guardian ad litem for the minor if a conflict of interests appears between the

---

**15.** Uncontroverted testimony of Drs. Allen Palmer, Naim Kassar, and Robert Crist. There was evidence that a high proportion of women desiring post-12 week abortions are in the younger age group. Reasons for delay in seeking an abortion by women under 18 include a lack of sophistication, psychological denial by the younger woman of the fact of her pregnancy, a concern for privacy, and a lack of knowledge and the means to seek an earlier abortion.

**16.** It may be argued that this infirmity is avoided by the provision in § 188.028 for judicial consent or judicially-granted self-consent to an abortion for a woman under 18. Even if that procedure was constitutionally valid, *see* Part IV, *infra*, it does not provide for judicial consent to hospitalization of a woman under 18 or

that Missouri hospitals must alter their admissions policies to accept either judicial consent or judicially-granted self-consent and admit women under 18 without parental consent.

Plaintiffs additionally argued: (1) that the increased cost, longer time required, and loss of anonymity associated with an in-hospital post-12 week abortion constitutes an undue burden on the effectuation of a pregnant woman's abortion decision; and (2) that the in-hospital requirement is actually contrary to the promotion of maternal health due to an increased risk of infection and the prevalent use of general anesthetics in most hospitals. In light of the above, it is not necessary to reach these arguments.

child and her parents or guardian. There is provision for the appointment of counsel, in appropriate circumstances, for "any party."

A hearing is to be held within five days of the filing of the petition, at which the court is to hear evidence relating to whether the minor should be granted the right to self-consent to an abortion or whether the abortion is in her best interest. The court is then to issue a decree in which it shall, for good cause, take one of the following actions: (1) grant the minor the right to self-consent; (2) find the abortion to be in the best interests of the minor and grant judicial consent, setting forth grounds for so finding; or (3) deny the minor's petition, setting forth grounds on which it was denied. Either the minor or her parents or guardian may appeal from such an order to the Missouri Court of Appeals by giving notice of intent to appeal within twenty-four hours from issuance of the order. The appeal must be perfected within five days of the filing of such notice. The section provides that the Missouri Supreme Court shall, by court rule, provide for expedited appellate review of such cases. Plaintiffs challenge the validity of the consent procedure for minors on the ground that it permits the juvenile court to deny a minor access to an abortion even though she may be sufficiently mature and competent to make the abortion decision on her own.[17]

In *Planned Parenthood v. Danforth, supra*, the Supreme Court struck down a requirement that unmarried minors obtain the consent of a parent or person in loco parentis.

[T]he State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy regardless of the reason for withholding the consent.

428 U.S. at 74, 96 S.Ct. at 2843. The Court further defined the constitutional limitations in this area in *Bellotti v. Baird (Bellotti II)*, 443 U.S. 622, 99 S.Ct. 3035, 61 L.Ed.2d 797 (1979), in which it concluded:

[I]f the State decides to require a pregnant minor to obtain one or both parent's consent to an abortion, it also must provide an alternative procedure whereby authorization for the abortion can be obtained.

443 U.S. at 643, 99 S.Ct. at 3048, 61 L.Ed.2d at 813 (plurality opinion of Powell, J.). In *Bellotti II* the Court considered a Massachusetts consent for minors statute which provided:

If the mother is less than eighteen years of age and has not married, the consent of both the mother and her parents [to an abortion to be performed on the mother] is required. If one or both of the mother's parents refuse such consent, consent may be obtained by order of a judge of the superior court for good cause shown, after such hearing as he deems necessary.

. . .

443 U.S. at 625, 99 S.Ct. at 3039, 61 L.Ed.2d at 802. Because the statute was susceptible of a construction which might sustain its validity, the Supreme Court initially abstained so that the courts of Massa-

---

**17.** Plaintiffs' attack on this section was not limited to a single issue. They also argued that the section is unconstitutional because (1) it mandates parental involvement in all cases, contrary to *Bellotti II, supra* (plurality opinion of Powell, J.), *see Charles v. Carey*, No. 79 C 454 (N.D.Ill. preliminary injunction filed Nov. 16, 1979); *Women's Community Health Center, Inc. v. Cohen*, 477 F.Supp. 542 (D.Me.1979); *Woman's Services, P.C. v. Thone*, —— F.Supp. —— (D.Neb. partial summary judgment filed Aug. 1, 1979); *Leigh v. Olson*, No. A3–79–78 (D.N.D. preliminary injunction filed July 9, 1979); (2) it creates an unjustified distinction between two classes of minors, those who consent to carry a pregnancy to term and undergo normal delivery or Caesarian section and those who consent to have an abortion, contrary to the holding in *Wynn v. Carey*, 582 F.2d 1375 (7th Cir. 1978); (3) the alternative judicial proceeding constitutes an undue burden on the abortion decision, *see Wynn v. Carey, supra*; (4) the statute is unconstitutionally vague because the term "emancipated" is not defined; and (5) that the judicial proceeding outlined in the section does not assure the "anonymity and sufficient expedition" required in *Bellotti II, supra*, (plurality opinion of Powell, J.), because it simply authorizes the future promulgation of rules to expedite appellate review in such cases. It is unnecessary to reach these arguments.

chusetts might provide a conclusive interpretation. *Bellotti v. Baird (Bellotti I)*, 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 (1976). The Supreme Judicial Court of Massachusetts interpreted the statute to authorize the court to refuse its consent if it determined that an abortion would not be in the best interests of the minor, even though the minor might be capable of making an informed and reasonable decision herself. 443 U.S. at 650, 99 S.Ct. at 3051–52, 61 L.Ed.2d at 817–18. The Supreme Court found the Massachusetts statute, as interpreted, constitutionally invalid.

> [I]f the minor satisfies a court that she has attained sufficient maturity to make a fully informed decision, she then is entitled to make her abortion decision independently. We therefore agree with the District Court that [the statute] cannot constitutionally permit judicial disregard of the abortion decision of a minor who has been determined to be mature and fully competent to assess the implications of the choice she has made.

443 U.S. at 650, 99 S.Ct. at 3052, 61 L.Ed.2d at 818 (plurality opinion of Powell, J.).[18]

Section 188.028.2(4) of the Missouri Act requires the juvenile court determine the issue of consent in one of three ways.

> (4) In the decree, the court shall for good cause:
>
> (a) Grant the petition for majority rights for the purpose of consenting to the abortion; or
>
> (b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or
>
> (c) Deny the petition, setting forth the grounds on which the petition is denied;
>
> . . . . .

Defendants contend that the court may deny the petition "provided that it finds that the minor is not mature, and that an abortion would not be in her best interest." Defendants' Posttrial Brief at 26. This procedure cures the defect in *Bellotti II*, say defendants, "because there is no opportunity for judicial authorization for an abortion to be withheld where a minor is found to be mature and competent to make the decision independently . . . ." *Id.*, at 27.

This Court is unable to subscribe to defendants' reading of the statute. Although the juvenile court is authorized to select one of three alternatives, each of the three is clearly independent of the others, connected in the statute with the disjunctive "or." Alternative (c) permits the court to "deny the petition," guided only by the general standard that such action be "for good cause." Defendants suggest that the legislative intent is clear that the juvenile court may deny the minor's petition *only* if it finds that an abortion is not in the best interests of the minor *and* that the minor is not competent to decide for herself. Such an intent is not evident in the statute nor was any such showing made at trial. It is clear to this Court that alternative (c) authorizes the juvenile court to deny the minor's petition for good cause, but does not require a prior finding that the minor is not sufficiently mature and not competent to make a decision regarding abortion independently.

Defendants alternatively request that the Court abstain from ruling, citing *Bellotti I*. In that case the Supreme Court said that abstention is appropriate if an unconstrued state statute is susceptible to a construction which might avoid the need for federal constitutional adjudication,[19] 428 U.S. at 146–47, 96 S.Ct. 2857, and found that partic-

---

18. [The Massachusetts statute] does, of course, provide an alternative in the form of a suit initiated by the woman in Superior Court. But in that proceeding, the judge is afforded an absolute veto over the minor's decisions, based on his judgment of her best interests.
443 U.S. at 654, 99 S.Ct. at 3053, 61 L.Ed.2d at 820 (concurring opinion of Stevens, J.).

19. The Court noted that the rule of the Supreme Judicial Court of Massachusetts which permits certification of questions directly to that court for prompt resolution "greatly simplifie[d]" the Court's analysis. There is no such procedure in Missouri.

ular statute susceptible to such a construction. It is clear to this Court that section 188.028 is not susceptible to a reasonable construction which would avoid the federal constitutional question controlling in *Bellotti II*. The statute permits the juvenile court to deny the minor's application but does not require that the court first find the minor not competent to make a decision independently. Accordingly, the Court declines to abstain.

The consent procedure in section 188.028 permits judicial authorization for an abortion to be withheld from a minor who is sufficiently mature and competent to make a decision regarding abortion independently, contrary to the ruling in *Bellotti II*. It creates the absolute veto proscribed in *Danforth* and, under that case and *Bellotti II*, is unconstitutional. *Scheinberg v. Smith*, 482 F.Supp. 529 (S.D.Fla.1979) (*see* memorandum opinion accompanying preliminary injunction filed July 13, 1979, *sub nom. Jones v. Smith*); *Akron Center for Reproductive Health, Inc. v. City of Akron*, 479 F.Supp. 1172 (N.D.Ohio 1979).

## V.

### *Abortion After Viability*

■ Section 188.030 regulates abortion in cases in which the fetus has reached viability. In three subsections, the statute prescribes when post-viability abortions may be performed, regulates the abortion technique to be employed, and requires the attendance of a second physician and a specified standard of care. Each subsection will be discussed in turn.

Defendants initially contend that no plaintiff has standing to challenge any part of section 188.030 because no plaintiff presently performs or desires to perform abortions past the stage at which the fetus is viable. Plaintiff Dr. Naim Kassar testified that, in the interests of maternal health, he has performed an abortion as late as approximately twenty-eight weeks gestation. Although the Supreme Court stated that it is not the function of either the legislature or the courts to place viability at a specific point in the gestation period, *Danforth, su-*

*pra*, 428 U.S. at 64, 96 S.Ct. 2831, the Court noticed in *Roe* that viability usually had been placed at about twenty-eight weeks, but could occur as early as twenty-four weeks. *Roe, supra*, 410 U.S. at 160, 93 S.Ct. 705. Enforcement of section 188.030 would have an immediate and direct effect on the medical practice of Dr. Kassar; he therefore has standing to contest its constitutional validity.

Subsection 1 provides that "[n]o abortion of a viable unborn child shall be performed unless necessary to preserve the life or health of the woman" and requires the physician certify in writing that such an abortion is necessary to preserve the life or health of the woman, the medical indications for the abortion, and the probable health consequences. The Act's penalty section mandates criminal liability for "[a]ny person who contrary to the provisions of [the Act] knowingly performs . . . any abortion . . . ." Plaintiffs argue that subsection 1, in conjunction with imposition of criminal liability, is unconstitutionally vague because it sets no standards regarding the determination of viability by the physician. Plaintiffs further argue that the subsection is unconstitutional because it would impose strict criminal liability on a physician for an erroneous, but good faith, determination of fetal nonviability.

In *Colautti v. Franklin*, 439 U.S. 379, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979) the Supreme Court ruled on a Pennsylvania statute which provided that "[e]very person who performs or induces an abortion shall prior thereto have made a determination based on his experience, judgment or professional competence that the fetus is not viable, and if the determination is that the fetus is viable or if there is sufficient reason to believe that the fetus may be viable," that the physician exercise a specified standard of care. Plaintiffs in that case argued that the viability determination requirement was unconstitutionally vague because it failed to inform the physician when his duty to the fetus arose and because it did not make the physician's good faith determination of viability conclusive.

The Court held the Pennsylvania viability determination requirement void for vagueness because of a "double ambiguity." The statute set no clear standard regarding the doctor's determination of fetal viability; whether it was to be a purely subjective determination or whether the physician was subject to a mixed subjective and objective standard.

> In other words, it is ambiguous whether there must be "sufficient reason" from the perspective of the judgment, skill, and training of the attending physician, or "sufficient reason" from the perspective of a cross-section of the medical community or a panel of experts. The latter, obviously portends not an inconsequential hazard for the typical private practitioner who may not have the skills and technology that are readily available at a teaching hospital or large medical center.

*Id.*, 439 U.S. at 391, 99 S.Ct. at 683, 58 L.Ed.2d at 606–07. Inclusion of the phrase "may be viable" injected a second ambiguity: whether the statute delineated some new time period in a pregnancy during which there might be a remote possibility of viability somewhere short of "viability" itself.

Compounding the vagueness of the statute, said the Court, was the fact that it "subjects the physician to potential criminal liability, without regard to fault." Although the criminal penalty provision did require scienter *with respect to the act of abortion*, there was no requirement of a culpable mental state *regarding the doctor's determination that the fetus is or "may be" viable*.[20]

> Because of the absence of a scienter requirement in the provision directing the physician to determine whether the fetus is or may be viable, the statute is little more than "a trap for those who act in good faith." [citation omitted]

The perils of strict criminal liability are particularly acute here because of the uncertainty of the viability determination itself. As the record in this case indicates, a physician determines whether or not a fetus is viable after considering a number of variables: the gestational age of the fetus, derived from the reported menstrual history of the woman; fetal weight, based on an inexact estimate of the size and condition of the uterus; the woman's general health and nutrition; the quality of the available medical facilities; and other factors. Because of the number and the imprecision of these variables, the probability of any particular fetus' obtaining meaningful life outside the womb can be determined only with difficulty. Moreover, the record indicates that even if agreement may be reached on the probability of survival, different physicians equate viability with different probabilities of survival, and some physicians refuse to equate viability with any numerical probability at all. In the face of these uncertainties, it is not unlikely that experts will disagree over whether a particular fetus in the second trimester has advanced to the stage of viability. The prospect of such disagreement, in conjunction with a statute imposing strict civil and criminal liability for an erroneous determination of viability, could have a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment.

*Id.*, 439 U.S. at 395, 99 S.Ct. at 685, 58 L.Ed.2d at 609–10. However, because the viability determination requirement was "void on its face," the Court in *Colautti* declined to decide in that case "whether, under a properly drafted statute, a finding of bad faith or some other type of scienter would be required before a physician could

---

**20.** The Court noted that the statute did provide a subjective standard for the determination of viability, and that it was ambiguous whether that standard also applied to the determination that the fetus "may be viable." However, the application of a subjective standard did not avoid the strict criminal liability issue. "A sub-jective standard keyed to the physician's individual skill and abilities, however, is different from a requirement that the physician be culpable or blameworthy for his performance under such a standard." *Collautti v. Franklin*, 439 U.S. at 395, 99 S.Ct. at 685, 58 L.Ed.2d at 609 n. 12.

be held criminally responsible for an erroneous determination of viability."

The Missouri regulation prohibits the abortion of a viable fetus, with the exception of necessity to preserve the life or health of the woman, and subjects the physician to criminal liability for its violation. Although the penalty provision requires a culpable mental state, "knowingly," regarding the act of abortion, neither the penalty section nor the substantive prohibition contains a culpable mental state requirement regarding the attending physician's necessary determination of fetal viability or nonviability. By its own terms, the statute is absolute. The physician who performs an abortion based on his good faith determination, in the exercise of his best medical judgment, that the fetus is not viable is subject to strict criminal liability if his determination is erroneous, regardless of his state of mind. Thus, the question deferred by the Supreme Court in *Colautti* is presented to this Court.

The record in this case relating to the determination of viability parallels that described by the Court in *Colautti*. The determination by the attending physician whether any particular pregnancy has passed the point of fetal viability is based on a number of variables, none of which is susceptible of precise determination, and is uncertain at best. Further, there is a difference of medical opinion regarding the probability of survival necessary before a fetus may be considered "viable."

The Supreme Court affirmed in *Danforth* that viability is a medical concept involving the judgment of the attending physician and his skill and technical ability, and by its nature is flexible and imprecise, varying with each pregnancy. It is clear to this Court that strict criminal liability attendant upon an erroneous determination by a physician that a particular pregnancy had not yet reached the point of viability not only offends due process [21] but denies the attending physician presented with a woman whose pregnancy is close to the point of viability "the room he needs to make his best medical judgment." *Doe v. Bolton*, 410 U.S. at 192, 93 S.Ct. at 747; *Colautti v. Franklin, supra.*[22] Accordingly, the regulation in subsection 1, which incorporates strict criminal liability for an erroneous determination of viability, cannot stand.

◼ Subsection 2 of § 188.030 requires that a physician performing an abortion past the point of viability utilize the abortion technique "most likely to preserve the life and health of the unborn child." The subsection further provides that the physician "may" employ some other abortion technique in cases

> where the method or technique of abortion which would most likely preserve the life and health of the unborn child *would present a greater risk* to the life and health of the woman than another available method or technique. (emphasis added)

The subsection goes on to require in such cases that the performing physician certify

**21.** *See Morissette v. United States*, 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952):

> The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of human will and a consequent ability and duty of the normal individual to choose between good and evil.

In *Holdridge v. United States*, 282 F.2d 302, 310 (8th Cir. 1960), then Judge, now Justice, Blackmun described the type of offense in which the absence of a culpable mental state would not offend due process:

> [W]here it seems to involve what is basically a matter of policy, where the standard imposed is, under the circumstances, reasonable and adherence thereto properly expected of a person, where the penalty is relatively small, where conviction does not gravely besmirch . . . .

The penalty provision of the Missouri Abortion Act, § 188.075, RSMo, provides that a violator is guilty of a class A misdemeanor which is punishable by a term of imprisonment not to exceed one year, § 558.011.1(5), RSMo, and a fine not exceeding $5,000, § 560.021.1(2).

**22.** The Supreme Court also noted in *Colautti* that strict criminal liability could have "a profound chilling effect on the willingness of physicians to perform abortions near the point of viability in the manner indicated by their best medical judgment."

in writing the techniques considered and the reasons for choosing the technique actually employed. Plaintiffs argue that subsection 2 is defective for the same reasons as is subsection 1; that it is unconstitutionally vague and that it subjects the physician to criminal liability without a culpable mental state.

The requirements of the subsection are triggered initially by the physician's determination of fetal viability. The physician is then called upon to determine which abortion technique is "most likely to preserve the life and health" of the fetus. The physician also must decide whether that technique mandated by the statute presents a "greater risk to the life and health of the woman" than some other abortion technique. These medical decisions and others of the same nature are a fundamental part of the daily practice of medical doctors; they have been and will be made every day, completely aside from this statutory requirement. Because of the nature of the science and art of medical practice, these determinations are often uncertain and difficult to make. Experts may, and often do, disagree on their resolution, both in specific cases and as general propositions.[23] Through the penalty provision, subsection 2 imposes strict criminal liability for an error in *any* of the above medical decisions, regardless of the physician's state of mind. For the reasons discussed in relation to subsection 1, the Court also finds subsection 2 to be constitutionally deficient. *See Colautti v. Franklin, supra.*

Subsection 2 also suffers from the vagueness fatal to the Pennsylvania statute considered by the Supreme Court in *Colautti.* Although the first sentence of subsection 2 mandates utilization of the abortion technique most favorable to the life and health of the fetus, the second sentence informs the doctor that he "may" use another technique, if that prescribed in the first sentence presents "a greater risk to the life and health of the woman" than some other technique. In this case, and as noted by the Supreme Court in *Colautti,* 439 U.S. at 400, 99 S.Ct. at 688, 58 L.Ed.2d at 612:

> it is uncertain whether the statute permits the physician to consider his duty to the patient to be paramount to his duty to the fetus, or whether it requires the physician to make a "trade-off" between the woman's health and additional percentage points of fetal survival. Serious ethical and constitutional difficulties, that we do not address, lurk behind this ambiguity. We hold only that where conflicting duties of this magnitude are involved, the State, at the least, must proceed with greater precision before it may subject a physician to possible criminal sanctions.

The difficulties noted by the Supreme Court are present in subsection 2. The lack of a culpable mental state requirement compounds the uncertainty. *Colautti v. Franklin, supra.*[24]

**23.** This record contains conflicting testimony from medical experts regarding the relative safety to the woman and to the fetus of various post-first trimester abortion techniques.

Testimony of Drs. Allen Palmer, Naim Kassar, Robert Crist, and Bernard Nathanson. *See Colautti v. Franklin,* 439 U.S. at 401, 99 S.Ct. at 688, 58 L.Ed.2d at 612: "The choice of an appropriate abortion technique, as the record in this case so amply demonstrates, is a complex medical judgment about which experts can—and do—disagree."

**24.** Defendants contend that the intent of the subsection is clearly not to require that the life of the fetus be favored over the life of the mother, and alternatively urge abstention in favor of a construction of the provision by the courts of Missouri should this Court find other-

wise, citing *Bellotti I.* The judge-made doctrine of abstention, *see Railroad Commission v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), is appropriate in a case in which a challenged state statute is susceptible to a construction by the state judiciary that would avoid or modify the necessity of reaching a federal constitutional question. *Zwickler v. Koota,* 389 U.S. 241, 88 S.Ct. 391, 19 L.Ed.2d 444 (1967). On the other hand, if it cannot be fairly concluded that the statute can be reasonably construed so as to avoid the necessity for federal constitutional adjudication, abstention is inappropriate and would amount to a shirking of the responsibilities of the federal courts. *Kusper v. Pontikes,* 414 U.S. 51, 94 S.Ct. 303, 38 L.Ed.2d 260 (1973). Because subsection 2 of § 188.030 is defective due to the absence of a culpable mental state requirement, the Court is

Subsection 3 requires the attendance of a second physician at any abortion performed past the point of viability, "who shall take control of and provide immediate medical care for a child born as a result of the abortion." It also prescribes a standard of care to be exercised by both physicians:

[They] shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman.

As with the two previous subsections, the Act's penalty provision imposes criminal liability on the physician who performs an abortion in violation of the regulation due to an erroneous determination of nonviability, without regard to the doctor's mental state. For the reasons discussed above, the Court finds this imposition of strict criminal liability with regard to a medical judgment unconstitutional.

The requirement of a second physician is also overbroad. The record shows that dilatation and evacuation may be the procedure of choice, even after viability, in cases in which there are positive contraindications to use of saline or prostaglandins instillation.[25] The experts agreed that D & E carries no chance of fetal survival. The Supreme Court has held that legislative enactments in this area involving fundamental rights "must be narrowly drawn to express only the legitimate state interests at stake." *Roe v. Wade*, 410 U.S. at 155, 93 S.Ct. at 728; *Carey v. Population Services International*, 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977). The state has an important and legitimate interest in potential life and may regulate abortion after viability to preserve the life and health of the fetus. *Roe v. Wade, supra.* Although the presence of a second physician

to care for the child born as a result of a post-viability abortion certainly may further the state's interest in the protection of potential life, the attendance of a second physician during an abortion procedure which holds no possibility of fetal survival does not further that interest. The two-physician regulation is therefore overboard and invalid on that basis.

## VI.

### *Informed Consent*

Section 188.039 prescribes a procedure to be followed by the woman's physician to secure and document her informed consent to the abortion. The physician must certify: (1) that he informed the woman of the information specified in the statute not less than forty-eight hours prior to her giving her consent to the abortion; (2) if the woman is a minor, that he also provided her parent, legal guardian, or person standing in loco parentis the same information; and (3) the woman's age, based on "proof of age" provided by her. The woman must sign a consent form to acknowledge that she has been informed by the attending physician of the following:

(1) That according to the best medical judgment of her attending physician she is pregnant;

(2) The number of weeks elapsed from the probable time of conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period and after a history and physical examination and appropriate laboratory tests;

(3) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed;

The court again notes that there is no procedure to certify questions for prompt resolution to the Missouri Supreme Court. *See Bellotti I*, 428 U.S. at 150–51, 96 S.Ct. 2857.

not convinced that resolution of the vagueness issue, *i. e.*, whether the duty of the physician to his female patient is paramount to the physician's duty to preserve the life and health of the fetus, by a definitive interpretation of the subsection by the Missouri courts would avoid eventual federal constitutional adjudication.

**25.** Testimony of Drs. Robert Crist (for plaintiffs) and Richard Schmidt (for defendants).

(4) The immediate and long-term physical dangers of abortion and psychological trauma resulting from abortion and any increased incidence of premature births, tubal pregnancies and still births following abortion;

(5) The particular risks associated with the abortion technique to be used;

(6) Alternatives to abortion shall be given by the attending physician, including a list of public and private agencies and services that will assist her during her pregnancy and after the birth of her child.

The section further provides that the physician may inform the woman of "other material facts or opinions" which may be necessary to allow the woman to be fully informed of the nature and consequences of an abortion.

Plaintiffs contend that the section's requirement that the information be given by the attending physician, rather than some other person, is unduly burdensome. At the clinic of plaintiff Reproductive Health Services, information relating to the woman's informed consent to an abortion, including much of the information required by the statute, is presented through an "informed consent" videotape of a doctor discussing the abortion procedure and through sessions with lay counselors, and does not come directly from the physician who actually performs the abortion procedure. Plaintiffs claim that this system was devised as the most efficient and economical method of delivery of this particular medical service and that it would be disrupted if the attending physician had to spend more time with each patient than is presently the practice, thereby increasing the cost of each procedure.[26] An effect of the requirement will be that the doctor who performs the abortion may have to spend more time with each patient than is currently the practice in plaintiffs' clinics. This may result in increased costs, although the additional expense to the patient will certainly depend on the amount of information required to be presented directly by the physician and the actual time required by a particular physician to convey it. On this record, the Court is not convinced that the requirement that information important to the woman's decision to have an abortion come directly from the attending physician is an undue burden on her decision to abort or her obtaining an abortion.[27] The Supreme Court has emphasized the participation and responsibility of the woman's physician regarding the decision to have an abortion and has noted the legitimacy of the state's interest that she make the decision with full knowledge of its nature and consequences. *Planned Parenthood v. Danforth, supra.* A

**26.** Testimony of Judith Widdicombe, R. N., Executive Director of Reproductive Health Services. Ms. Widdicombe estimated that the cost per procedure would increase by $70 if the attending physician were required to spend an additional 30 minutes with each patient.

Plaintiffs also argue that this requirement, in conjunction with the 48 hour waiting period, could result in delays of substantially more than 48 hours. Physicians perform abortions at Reproductive Health Services' clinic on a part-time basis, perhaps one afternoon per week. If the physician must give information to each patient on whom he performs an abortion 48 hours prior to the procedure, say plaintiffs, delays of one week or more would result, simply because the doctor would not be present at the clinic for at least a week after the initial session with the patient. Plaintiffs argue that the patient's personal schedule might delay the procedure even longer if she could not arrange to come to the clinic on the day on which the physician who presented the information to her was in attendance. The Court notes that plain-

tiffs have made a showing that the combination of a mandatory waiting period with the requirement that certain information be conveyed by the physician who actually performs the abortion would present a practical problem to plaintiffs' clinics, one result of which could be significant delay between the woman's initial visit and the abortion itself. The 48 hour waiting period has been stricken as an unconstitutional burden on obtaining an abortion.

**27.** Testimony regarding the time necessary for a physician to present *all* of the information specified in the statute ranged from 15 minutes to an hour and a half. Some items specified in the section have been stricken as unconstitutional.

It is conceivable that a regulation might require a presentation by the attending physician so lengthy as to become unduly burdensome, although such a finding is not supported by this record.

requirement that the attending physician personally provide information regarding the abortion decision furthers that interest and is not unconstitutional.[28]

▇▇ Plaintiffs challenge the forty-eight hour waiting period as an undue burden on the abortion decision which actually increases the risk to the woman's health. The experts seem to be in accord that the length of gestation at the time of abortion is directly related to the risk presented by the procedure to the woman's life and health, the risk increasing the later an abortion is performed.[29] The Court is convinced that the forty-eight hour delay imposed by the statute would have, in the words of plaintiffs' expert, a "significant health impact" on a woman seeking an abortion.[30] There was additional testimony that a mandatory forty-eight hour waiting period could have the effect of a much longer delay due to the nature of physicians' working schedules.[31] The record shows that such delay has a disproportionate impact on minors, who generally seek abortions at a later stage of pregnancy.[32]

Defendants argue that the waiting period is designed to ensure that the abortion decision is made with "adequate reflection and consideration," and as such furthers the state's interest in maternal health. However, there was expert testimony at trial which indicated that, as a general proposition, women seeking abortions have com-

pletely thought out the abortion decision prior to approaching a clinic or personal doctor.[33]

The forty-eight hour waiting period requires that a woman make a minimum of two visits to her physician or to a clinic. This requirement involves additional time and expense and, for women living outside the metropolitan areas, may require additional travel or subsistence expense during the delay.

This Court concludes that the mandatory forty-eight hour waiting period has, in fact, a detrimental effect on the health interests of women seeking abortions and therefore lacks a rational relation with any legitimate state interest. Moreover, the mandatory waiting period is unduly burdensome to women seeking abortions. *Bellotti I, supra.* For both reasons, the mandatory forty-eight hour waiting period is unconstitutional.[34]

▇▇ Plaintiffs claim that the requirement that the physician certify the woman's age based upon "proof of age offered by her" is void for vagueness. The Court cannot agree. A physician's good faith certification of a woman's age based on as little proof as the woman's own declaration or written statement of her age would satisfy the statute. There is no constitutional infirmity.

---

**28.** See *Akron Center for Reproductive Health, Inc. v. City of Akron,* 479 F.Supp. 1172 (N.D. Ohio 1979); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542 (D.Me.1979).

**29.** Within the first 12 weeks, the main risk to a woman who wants an abortion results from delay.

Our findings clearly demonstrate that *any* delay increases the risk of complications to a pregnant woman who wishes an abortion. (emphasis in original)
Willard Cates, Jr., et al., *The Effect of Delay and Method Choice on the Risk of Abortion Morbidity,* 9 Family Planning Perspectives 266, 267–68 (1977) (reprinted by Public Health Service, U.S. Dep't of H.E.W.).

**30.** Testimony of Dr. Robert Crist.

**31.** Testimony of Drs. Allen Palmer and Robert Kretzschmar. *See* note 26, *supra.*

**32.** Testimony of Drs. Enrique Vera, Robert Kretzschmar, Grace Ketterman, and Dr. Elizabeth Smith. *See* note 15, *supra.*

**33.** Testimony of Dr. Enrique Vera.

**34.** *Accord, Womens Services, P.C. v. Thone,* 483 F.Supp. 1022 (D.Neb.1979) (48 hours); *Women's Community Health Center, Inc. v. Cohen,* 477 F.Supp. 542 (D.Me.1979) (48 hours); *Leigh v. Olson,* No. A3–79–78 (D.N.D. preliminary injunction filed July 9, 1979) (48 hours); *But see Wolfe v. Schroering,* 541 F.2d 523 (6th Cir. 1976) (24 hours). (no argument that delay "significantly burdens the abortion process"); *Akron Center for Reproductive Health, Inc. v. City of Akron,* 479 F.Supp. 1172 (N.D.Ohio 1979) (24 hours).

In the case of a minor, subsection 2 requires that not only she but also "her parent or legal guardian or person standing in loco parentis" be informed of specified information by the attending physician before she may obtain an abortion. The Court agrees with plaintiffs' contention that this regulation constitutes an undue burden on a minor seeking an abortion. The subsection make no distinction between a minor still living in her parents' home and an emancipated minor who might be living independently and at some distance from her parents or guardian. The requirement contains no exception, for instance, for parents who may be difficult to contact or who may live thousands of miles from the location of the attending physician. It does not provide that absent parents or parents impossible to contact may be informed constructively. As written in this subsection, the requirement that parents or guardian be informed prior to a minor obtaining an abortion could inject substantial delay into the process and, in some cases, could constitute an insurmountable obstacle. It is unconstitutional as an undue burden on a minor seeking an abortion.

Plaintiffs' remaining objections to section 188.039 concern the specific information required to be presented by the attending physician to every woman seeking an abortion. This regulation to ensure "truly informed consent" must be considered in light of *Planned Parenthood v. Danforth*, in which the Supreme Court upheld a prior Missouri requirement that the woman give "informed" consent in writing. Answering a vagueness challenge to the term "informed," the Court stated, 428 U.S. at 67 n.8, 96 S.Ct. at 2840:

> [W]e are inclined to accept, as the meaning [of "informed" consent], the giving of information to the patient as to just what would be done and as to its consequences. To ascribe more meaning than this might well confine the attending physician in an undesired and uncomfortable straitjacket in the practice of his profession.

The Eighth Circuit interpreted that statement in *Freiman v. Ashcroft*, 584 F.2d 247, 251 (8th Cir. 1978), *summarily aff'd*, 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979). "[T]he Supreme Court did not hold that a state may require physicians to provide to each patient any and all information required by the state, regardless of its legality, truth, constitutionality or medical advisability." The state has a legitimate interest in protecting women by ensuring that the decision to have an abortion is made with knowledge of the nature and consequences of the abortion procedure. *Planned Parenthood v. Danforth, supra.* However, specific regulations in this area may not, consistent with the reasoning in *Danforth*, have a "straitjacket" effect on the attending physician. There is a danger that specific information requirements may force the physician to do something *other* than what he considers to be best for his patient.[35]

The first two items require the physician to inform the woman "[t]hat according to the best medical judgment of her attending physician she is pregnant," and "[t]he number of weeks elapsed from the probable time of conception . . .." Both plaintiffs' and defendants' experts testified that, apart from the statute, presenting such information to the patient seeking an abortion is good medical practice and would be done as a matter of course in almost all abortion cases. It is the exception which underlies plaintiffs' constitutional objection to these items.

The procedure known as menstrual extraction is the removal of uterine contents prior to a positive pregnancy test. The purpose of the procedure is to correct a menstrual disorder and/or to abort a very early pregnancy.[36] At the stage at which the procedure is done it is not presently possible to determine whether the woman is

**35.** Testimony of Dr. Enrique Vera.

**36.** Dr. Robert Crist estimated that, within a reasonable medical certainty, 85% of those women with a menstrual period 10 days late are, in fact, pregnant.

in fact pregnant;[37] in practice the procedure is done with disregard to that question.[38] A menstrual extraction is intended to and in many cases does result in an abortion. Because the statute requires the physician to tell his patient that she *is* pregnant[39] and the length of her pregnancy prior to performing an abortion, a menstrual extraction performed prior to a positive pregnancy test and resulting in an abortion is unlawful. This could cause a woman seeking an early abortion to wait until such time as current technology enabled her physician to determine that she is in fact pregnant. A regulation which has the effect of outlawing a safe abortion technique utilized in the very early stages of pregnancy does not survive even rational basis inquiry.[40]

■ The physician also is required to relate to every woman who seeks an abortion the "probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed" and the "immediate and long-term physical dangers of abortion and psychological trauma resulting from abortion and any increased incidence of premature births, tubal pregnancies and still births following abortion." From the testimony and other evidence presented at trial, the Court concludes that these two items constitute an impermissible intrusion into the privacy of the doctor-patient relationship and interfere with the right of a woman to consult with her physician regarding abortion free from state interference.[41]

It is clear that many physicians believe that a mandatory presentation on fetal anatomy and physiology is not in the best health interests of many, if not all, of their patients seeking abortions. There was evidence that most women seeking an abortion do not desire such anatomical information[42] and that the giving of such information may have adverse effects in the form of emotional tension, increased anxiety and fright.[43] It is also clear that many physicians believe that there are no long-term physical or psychological effects of abortion or are unaware of such effects.[44] It is certainly not for this Court to say whether such long-term dangers actually exist. It is sufficient to note that the evidence demonstrates that many physicians believe that such information is highly debatable or is simply not factual, based on present medical knowledge.

It is evident that such physicians, in the exercise of their best medical judgment, would choose not to provide their patients seeking abortions with a detailed anatomical description of the fetus. It is also evident that such physicians would choose not to provide information regarding long-term dangers they believe not to exist. These two requirements impose the "straitjacket" foreseen in *Planned Parenthood v. Danforth*. They mandate what must be

37. Testimony of Drs. Allen Palmer, Robert Crist, Robert Kretzschmar, and Richard Schmidt. There is nothing in this record to indicate the existence of a reliable pregnancy test at this early stage of pregnancy.

38. Testimony of Dr. Allen Palmer.

39. The statute does not require the physician to tell his patient *whether* she is pregnant; it requires the affirmative statement that she *is* pregnant.

40. *Contra, Planned Parenthood v. Fitzpatrick,* 401 F.Supp. 554 (E.D.Pa.1975), *summarily aff'd sub nom. Franklin v. Fitzpatrick,* 428 U.S. 901, 96 S.Ct. 3202, 49 L.Ed.2d 1205 (1976) (this issue was not part of that appeal).

41. Plaintiffs also make a strong argument that the requirement that the physician relate the "probable anatomical and physiological characteristics" of the fetus, enforced by criminal sanctions, is void for vagueness.

42. Testimony of Dr. Robert Kretzschmar and Dr. Elizabeth Smith.

43. Testimony of Drs. Allen Palmer, Robert Crist, Naim Kassar, and Enrique Vera. These experts also testified that such adverse emotional effects may require use of anesthetics in greater amounts, thereby increasing risk to the woman's health.

44. Testimony of Drs. Allen Palmer, Naim Kassar, Robert Crist, and Robert Kretzschmar. Dr. Richard Dickey testified to the contrary, that induced abortion may carry a risk to the woman's future fertility and may cause a greater likelihood of spontaneous abortion (miscarriage) in subsequent pregnancies.

presented by the physician *to each and every patient,* regardless of the doctor's view on the subject or his professional opinion of the medical advisability of presenting such information in any particular case. These requirements deprive the woman seeking an abortion of the right to consult with her physician and rely on his discretion and professional judgment. *Roe v. Wade, supra.*[45]

The final two items required to be presented to the woman seeking an abortion are "[t]he particular risks associated with the abortion technique to be used" and the "alternatives to abortion," including "a list of public and private agencies and services that will assist her during her pregnancy and after the birth of her child." Information regarding the risks associated with the technique to be employed and the alternatives available to the woman may be required by the state to ensure informed consent consistent with *Planned Parenthood v. Danforth. See Hodgson v. Lawson,* 542 F.2d 1350 (8th Cir. 1976); *Women's Services, P.C. v. Thone,* —— F.Supp. —— (D.Neb.1979). However, the requirement that the attending physician provide each of his patients with "a list of agencies" is void for vagueness. It is revealing to consider the range of testimony of both sides' experts describing the list which is required to be furnished, at the risk of criminal liability for noncompliance: "a list of *all* such agencies (there may be several hundred)"; "it is impossible to compile a complete list"; "it would include every agency in the metropolitan area"; "it would include only one public and one private agency"; "it would include only those agencies of which the physician was personally aware." A criminal statute which fails to give a person of ordinary intelligence fair notice of what is required or proscribed is unconstitutionally vague. *United States v. Harriss,* 347 U.S. 612, 617, 74 S.Ct. 808, 98 L.Ed. 989 (1954). The Court finds that the "list of agencies" requirement fails to provide physicians with the fair notice that is constitutionally required.

The Court finds that the Missouri General Assembly would have enacted those parts of section 188.039 not declared unconstitutional independently from the stricken portions, and further finds that the valid provisions are not so connected and so dependent upon the stricken provisions as to preclude that finding. Accordingly, the provisions declared to be unconstitutional will be severed and stricken, allowing the remainder of the section to stand.[46] *See* § 1.140, RSMo; *United States v. Jackson,* 390 U.S. 570, 585, 88 S.Ct. 1209, 20 L.Ed.2d 138 (1968).

## VII.

### *Pathology Report*

Section 188.047 requires that a sample of the tissue removed at the time of abortion be submitted to a pathologist, who must file copies of the tissue report with the facility at which the abortion is performed and with the state division of health. Plaintiffs contend that the additional cost of a tissue examination is unduly burdensome and that the requirement of an examination by a pathologist in every abortion case cannot be justified under traditional medical cost/benefit analysis; that such an examination in every case is simply unnecessary and serves no rational purpose.[47] The Court has not been shown that

---

45. *See Freiman v. Ashcroft,* 584 F.2d 247 (8th Cir. 1978), *summarily aff'd,* 440 U.S. 941, 99 S.Ct. 1416, 59 L.Ed.2d 630 (1979); *Women's Services, P.C. v. Thone,* 483 F.Supp. 1022 (D.Neb.1979); *Akron Center for Reproductive Health, Inc. v. City of Akron,* 479 F.Supp. 1172 (N.D.Ohio 1979); *Leigh v. Olson,* No. A3–79–78 (D.N.D. preliminary injunction filed July 9, 1979).

46. Of course, the reference in § 188.039.1 to "the information contained in subsection 2 of this section" may refer constitutionally only to those portions of subsection 2 not declared invalid.

47. Plaintiff physicians testified that a gross or macroscopic examination of the tissue removed during abortion is done in any event by the performing physician, who then decides wheth-

the increase in cost per abortion procedure resulting from the required tissue examination will constitute an undue burden on a woman seeking an abortion.[48] Defendants argue that the required tissue examination furthers the state's legitimate interest in the maintenance of good medical standards. In spite of plaintiffs' contentions that the tissue examination required by the statute is duplicative and not justifiable as a procedure to be done in every case, this Court cannot say that such a required examination is not rationally related to a legitimate state interest in the standard of medical care provided its citizens who undergo abortions.[49] The section is not unconstitutional. *See Wynn v. Scott*, 449 F.Supp. 1302, 1322 (N.D.Ill.1978), *aff'd*, 599 F.2d 193 (7th Cir. 1979).

## VIII.

### Reporting Requirements

 Section 188.052 imposes recordkeeping and reporting obligations regarding the abortion procedure itself and the treatment of any resulting complications.[50] The Court finds the requirements contained in this section to be consistent with the holding in *Planned Parenthood v. Danforth* and therefore constitutional. *See Hodgson v. Lawson*, 542 F.2d 1350 (8th Cir. 1976). As did the Supreme Court in *Danforth*, this Court relies on the assumption that such regulations will not be utilized and enforced in such a way as to constitute an undue burden through the sheer volume of recordkeeping.

er examination by a pathologist is indicated. Ms. Widdicombe testified that a tissue examination by a pathologist is ordered in only 12% of abortion cases at Reproductive Health Services' clinic.

**48.** The expert's testimony regarding the cost per patient of a required tissue examination by a pathologist ranged from $10 to $40. Ms. Widdicombe's estimate of the cost of compliance for plaintiff Reproductive Health Services was $19.40 per abortion procedure.

**49.** Several of defendants' medical experts testified that pathology should be done in every case of abortion. Testimony of Drs. Bernard

## IX.

### Regulation of Abortion-Related Counseling

 Section 188.063 regulates counseling services relating to abortion. It sets minimum standards of education and training for counselors and regulates the content of counseling offered to pregnant women by requiring discussion of specified topics. The Court need not look beyond plaintiffs' equal protection argument.[51] By its own terms, the section applies only to an "abortion facility." The Act defines "abortion facility" as "a clinic, physician's office, or any other place or facility in which abortions are performed *other than a hospital.*" § 188.015(2), RSMo (the Court's emphasis). Thus, the section regulates counseling services relating to abortion offered in clinics, such as those operated by the corporate plaintiffs, but leaves the same services unregulated if offered in a hospital. Defendants offer no justification, either related to the purpose of the regulation or otherwise, for such difference in treatment. With respect to abortion-related counseling services, the Court finds no rational reason for the distinction between hospitals and abortion facilities other than hospitals. The section is unconstitutional as violative of the equal protection clause of the fourteenth amendment of the Constitution.

## X.

### Conclusion

For the reasons above-stated, the following portions of the 1979 Missouri act relat-

Nathanson, Pierre Keitges, Richard Schmidt, and Daniel Martin.

**50.** Section 188.055 provides that all recordkeeping and reporting required under the Act shall be confidential and used only for statistical purposes.

**51.** Plaintiffs make a compelling argument that the section is also void for vagueness because it involves the imposition of criminal liability for behavior to be measured by vague statutory standards, *e. g.*, "appropriate field," "factual information," "not to be misleading," "explicit discussion," and "thorough discussion."

ing to the regulation of abortions are hereby declared to be unconstitutional:

1. § 188.025;
2. § 188.028;
3. § 188.030;
4. The following portions of § 188.039:
 A. From § 188.039.1, the phrase "not less than forty-eight hours prior to her consent to the abortion,";
 B. From § 188.039.2, the phrase "and, if she is a minor, her parent or legal guardian or person standing in loco parentis";
 C. § 188.039.2(1)–(4);
 D. From § 188.039.2(6), the phrase "including a list of public and private agencies and services that will assist her during her pregnancy and after the birth of her child."
5. § 188.063.

■ At the conclusion of trial, defendants stated on the record that they will abide by this Court's declaration regarding the validity of any part of the Act. The Court assumes that all prosecutorial authorities of the State of Missouri will likewise abide by this Court's judgment. Accordingly, no injunctive order will issue at this time.

IT IS SO ORDERED.

## APPENDIX

AN ACT to repeal sections 188.015, 188.-020, 188.025, 188.030, 188.035, 188.050, 188.-055, 188.060, and 188.075, RSMo 1978, relating to regulation of abortions, and to enact in lieu thereof fifteen new sections relating to the same subject, with penalty provisions and an emergency clause.

Be it enacted by the General Assembly of the State of Missouri, as follows:

Section 1. Sections 188.015, 188.020, 188.025, 188.030, 188.035, 188.050, 188.055, 188.060 and 188.075, RSMo 1978 are repealed and fifteen new sections enacted in lieu thereof, to be known as sections 188.-015, 188.020, 188.025, 188.027, 188.028, 188.-030, 188.035, 188.037, 188.039, 188.047, 188.-052, 188.055, 188.060, 188.063 and 188.075, to read as follows:

188.015. Unless the language or context clearly indicates a different meaning is intended, the following words or phrases for the purposes of sections 188.010 to 188.085 shall be given the meaning ascribed to them:

(1) "Abortion", the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child;

(2) "Abortion facility", a clinic, physician's office, or any other place or facility in which abortions are performed other than a hospital;

(3) "Conception", the fertilization of the ovum of a female by the sperm of a male;

(4) "Physician", any person licensed to practice medicine in this state by the state board of registration of the healing arts;

(5) "Unborn child", the offspring of human beings from the moment of conception until birth and at every stage of its biological development, including the human conceptus, zygote, morula, blastocyst, embryo, and fetus;

(6) "Viability", that stage of fetal development when the life of the unborn child may be continued indefinitely outside the womb by natural or artificial life-support-ive systems.

188.020. No person shall perform or induce an abortion except a physician.

188.025. Every abortion performed subsequent to the first twelve weeks of pregnancy shall be performed in a hospital.

188.027. No abortion shall be performed except with the prior, informed and written consent freely given of the pregnant woman.

188.028. 1. No person shall knowingly perform an abortion upon a pregnant woman under the age of eighteen years unless:

(1) The attending physician has secured the informed written consent of the minor and one parent or guardian; or

(2) The minor is emancipated and the attending physician has received the informed written consent of the minor; or

(3) The minor has been granted the right to self-consent to the abortion by court order pursuant to subsection 2 of this section, and the attending physician has received the informed written consent of the minor; or

(4) The minor has been granted consent to the abortion by court order, and the court has given its informed written consent in accordance with subsection 2 of this section, and the minor is having the abortion willingly, in compliance with subsection 3 of this section.

2. The right of a minor to self-consent to an abortion under subdivision (3) of subsection 1 of this section or court consent under subdivision (4) of subsection 1 of this section may be granted by a court pursuant to the following procedures:

(1) The minor or next friend shall make an application to the juvenile court which shall assist the minor or next friend in preparing the petition and notices required pursuant to this section. The minor or the next friend of the minor shall thereafter file a petition setting forth the initials of the minor; the age of the minor; the names and addresses of each parent, guardian, or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis of the minor; that the minor has been fully informed of the risks and consequences of the abortion; that the minor is of sound mind and has sufficient intellectual capacity to consent to the abortion; that, if the court does not grant the minor majority rights for the purpose of consent to the abortion, the court should find that the abortion is in the best interest of the minor and give judicial consent to the abortion; that the court should appoint a guardian ad litem of the child; and if the minor does not have private counsel, that the court should appoint counsel. The petition shall be signed by the minor or the next friend;

(2) Copies of the petition and a notice of the date, time, and place of the hearing shall be personally served upon each parent, guardian or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis of the minor listed in the petition by the sheriff or his deputy. If a parent or guardian or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis cannot be personally served within two days after reasonable effort, the sheriff or his deputy shall give constructive notice to them by certified mail to their last known address and the hearing shall not be held for at least forty-eight hours from the time of the mailing. In any case where there exists the potential or appearance of conflict of interests between the parents or guardian or next friend of the child and the child, the court shall appoint a guardian ad litem to defend the minor's interests. The court shall set forth, for the record, the grounds for such appointment;

(3) A hearing on the merits of the petition, to be held on the record, shall be held as soon as possible within five days of the filing of the petition. If any party is unable to afford counsel, the court shall appoint counsel at least twenty-four hours before the time of the hearing. At the hearing, the court shall hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature, possible consequences, and alternatives to the abortion; and any other evidence that the court may find useful in determining whether the minor should be granted majority rights for the purpose of consenting to the abortion or whether the abortion is in the best interests of the minor;

(4) In the decree, the court shall for good cause:

(a) Grant the petition for majority rights for the purpose of consenting to the abortion; or

(b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or

(c) Deny the petition, setting forth the grounds on which the petition is denied;

(5) If the petition is allowed, the informed consent of the minor, pursuant to a court grant of majority rights, or the judicial consent, shall bar an action by the parents or guardian of the minor on the grounds of battery of the minor by those performing the abortion. The immunity granted shall only extend to the performance of the abortion in accordance herewith and any necessary accompanying services which are performed in a competent manner. The costs of the action shall be borne by the parties.

(6) An appeal from an order issued under the provisions of this section may be taken to the court of appeals of this state by the minor or by a parent or guardian of the minor. The notice of intent to appeal shall be given within twenty-four hours from the date of issuance of the order. The record on appeal shall be completed and the appeal shall be perfected within five days from the filing of notice to appeal. Because time may be of the essence regarding the performance of the abortion, the supreme court of this state shall, by court rule, provide for expedited appellate review of cases appealed under this section.

3. If a minor desires an abortion, then she shall be orally informed of and, if possible, sign the written consent required by section 188.039 in the same manner as an adult person. No abortion shall be performed on any minor against her will, except that an abortion may be performed against the will of a minor pursuant to a court order described in subdivision (4) of subsection 1 of this section that the abortion is necessary to preserve the life of the minor.

188.030. 1. No abortion of a viable unborn child shall be performed unless necessary to preserve the life or health of the woman. Before a physician may perform an abortion upon a pregnant woman after such time as her unborn child has become viable, such physician shall first certify in writing that the abortion is necessary to preserve the life or health of the woman and shall further certify in writing the medical indications for such abortion and the probable health consequences.

2. Any physician who performs an abortion upon a woman carrying a viable unborn child shall utilize the available method or technique of abortion most likely to preserve the life and health of the unborn child. In cases where the method or technique of abortion which would most likely preserve the life and health of the unborn child would present a greater risk to the life and health of the woman than another available method or technique, the physician may utilize such other method or technique. In all cases where the physician performs an abortion upon a viable unborn child, the physician shall certify in writing the available method or techniques considered and the reasons for choosing the method or technique employed.

3. An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance of the abortion, the physician performing it, and subsequent to the abortion, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman.

188.035. Whoever, with intent to do so, shall take the life of a child aborted alive, shall be guilty of murder of the second degree.

188.037. No person shall use any fetus or child aborted alive for any type of scientific, research, laboratory or other kind of experimentation either prior to or subsequent to any abortion procedure except as necessary to protect or preserve the life and health of such fetus or child aborted alive.

188.039. 1. No physician shall perform an abortion unless, prior to such abortion,

the physician certifies in writing that the woman gave her informed consent, freely and without coercion, after the attending physician had informed her of the information contained in subsection 2 of this section not less than forty-eight hours prior to her consent to the abortion, and shall further certify in writing the pregnant woman's age, based upon proof of age offered by her.

2. In order to insure that the consent for an abortion is truly informed consent, no abortion shall be performed or induced upon a pregnant woman unless she has signed a consent form that shall be supplied by the state division of health, acknowledging that she and, if she is a minor, her parent or legal guardian or person standing in loco parentis have been informed by the attending physician of the following facts:

(1) That according to the best medical judgment of her attending physician she is pregnant;

(2) The number of weeks elapsed from the probable time of conception of her unborn child, based upon the information provided by her as to the time of her last menstrual period and after a history and physical examination and appropriate laboratory tests;

(3) The probable anatomical and physiological characteristics of the unborn child at the time the abortion is to be performed;

(4) The immediate and long-term physical dangers of abortion and psychological trauma resulting from abortion and any increased incidence of premature births, tubal pregnancies and still births following abortion;

(5) The particular risks associated with the abortion technique to be used;

(6) Alternatives to abortion shall be given by the attending physician, including a list of public and private agencies and services that will assist her during her pregnancy and after the birth of her child.

3. The physician may inform the woman of any other material facts or opinions, or provide any explanation of the above information which, in the exercise of his best medical judgment, is reasonably necessary to allow the woman to give her informed consent to the proposed abortion, with full knowledge of its nature and consequences.

188.047. A representative sample of tissue removed at the time of abortion shall be submitted to board eligible or certified pathologist, who shall file a copy of the tissue report with the state division of health, and who shall provide a copy of the report to the abortion facility or hospital in which the abortion was performed or induced and the pathologist's report shall be made a part of the patient's permanent record.

188.052. 1. An individual abortion report for each abortion performed or induced upon a woman shall be completed by her attending physician.

2. An individual complication report for any post-abortion care performed upon a woman shall be completed by the physician providing such post-abortion care. This report shall include:

(1) The date of the abortion;

(2) The name and address of the abortion facility or hospital where the abortion was performed;

(3) The nature of the abortion complication diagnosed or treated.

3. All abortion reports shall be signed by the attending physician, and submitted to the state division of health within forty-five days from the date of the abortion. All complication reports shall be signed by the physician providing the post-abortion care and submitted to the division of health within forty-five days from the date of the post-abortion care.

4. A copy of the abortion report shall be made a part of the medical record of the patient of the facility or hospital in which the abortion was performed.

5. The state division of health shall be responsible for collecting all abortion reports and complication reports and collating and evaluating all data gathered therefrom and shall annually publish a statistical report based on such data from abortions performed in the previous calendar year.

188.055. 1. Every abortion facility, hospital, and physician shall be supplied with

forms by the division of health for use in regards to the consents and reports required by sections 188.010 to 188.085. A purpose and function of such consents and reports shall be the preservation of maternal health and life by adding to the sum of medical knowledge through the compilation of relevant maternal health and life data and to monitor all abortions performed to assure that they are done only under and in accordance with the provisions of the law.

2. All information obtained by physician, hospital, or abortion facility from a patient for the purpose of preparing reports to the division of health under sections 188.-010 to 188.085 or reports received by the division of health shall be confidential and shall be used only for statistical purposes. Such records, however, may be inspected and health data acquired by local, state, or national public health officers.

188.060. All medical records, reports, and other documents required to be kept under sections 188.010 to 188.085 shall be maintained in the permanent files of the abortion facility or hospital in which the abortion was performed for a period of seven years.

188.063. No abortion facility shall advertise or hold itself out as also providing counseling to pregnant women unless:

(1) The counseling is done by a licensed physician, registered nurse or other person holding at least a bachelor's degree from an accredited college or university in psychology or appropriate field or having completed special training in counseling;

(2) The counseling includes factual information given in such a manner as to not be misleading, including explicit discussion of the development of the unborn child; and

(3) The counseling includes a thorough discussion of alternatives to abortion and availability of agencies and services to assist her if she chooses to carry her child to term.

2. The prescribed course of study which shall constitute special training in counseling shall be promulgated by the division of health. Any rule or portion of a rule promulgated pursuant to this chapter may be suspended by the joint committee on administrative rules if after hearing thereon the committee finds that such rule or portion of the rule is beyond or contrary to the statutory authority of the agency which promulgated the rule, or is inconsistent with the legislative intent of the authorizing statute. The general assembly may reinstate such rule by concurrent resolution signed by the governor.

188.075. Any person who contrary to the provisions of sections 188.010 to 188.085 knowingly performs or aids in the performance of any abortion or knowingly fails to perform any action required by sections 188.010 to 188.085 shall be guilty of a class A misdemeanor and, upon conviction, shall be punished as provided by law.

Section A. Because of the necessity for immediate state action to regulate abortions to protect the lives and health of citizens of this state, this act is deemed necessary for the immediate preservation of the public health, welfare, peace and safety, and is hereby declared to be an emergency act within the meaning of the constitution, and this act shall be in full force and effect upon its passage and approval.