# PLANNED PARENTHOOD ASSOCIATION OF KANSAS CITY, MISSOURI, INC., ET AL. *v.* ASHCROFT, ATTORNEY GENERAL OF MISSOURI, ET AL.

No. 81–1255.   Argued November 30, 1982—Decided June 15, 1983*

---

*Together with No. 81–1623, *Ashcroft, Attorney General of Missouri, et al.* v. *Planned Parenthood Association of Kansas City, Missouri, Inc., et al.*, also on certiorari to the same court.

POWELL, J., announced the judgment of the Court in Part VI and delivered the opinion of the Court with respect to Parts I and II, in which BURGER, C. J., and BRENNAN, MARSHALL, BLACKMUN, and STEVENS, JJ., joined, and an opinion with respect to Parts III, IV, and V, in which BURGER, C. J., joined. BLACKMUN, J., filed an opinion concurring in part and dissenting in part, in which BRENNAN, MARSHALL, and STEVENS, JJ., joined, *post*, p. 494. O'CONNOR, J., filed an opinion concurring in the judgment in part and dissenting in part, in which WHITE and REHNQUIST, JJ., joined, *post*, p. 505.

*Frank Susman* argued the cause and filed briefs for petitioners in No. 81–1255 and respondents in No. 81–1623.

*John Ashcroft*, Attorney General of Missouri, *pro se*, argued the cause for respondents in No. 81–1255 and petitioners in No. 81–1623. With him on the briefs was *Michael L. Boicourt*, Assistant Attorney General.†

---

†*Dennis J. Horan, Victor G. Rosenblum, Patrick A. Trueman,* and *Thomas J. Marzen* filed a brief for Americans United for Life as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Sylvia A. Law, Nadine Taub,* and *Ellen J. Winner* for the Committee for Abortion Rights

JUSTICE POWELL announced the judgment of the Court in Part VI and delivered the opinion of the Court with respect to Parts I and II and an opinion with respect to Parts III, IV, and V, in which THE CHIEF JUSTICE joins.

These cases, like *City of Akron* v. *Akron Center for Reproductive Health, Inc., ante,* p. 416, and *Simopoulos* v. *Virginia, post,* p. 506, present questions as to the validity of state statutes or local ordinances regulating the performance of abortions.

I

Planned Parenthood Association of Kansas City, Missouri, Inc., two physicians who perform abortions, and an abortion clinic (plaintiffs) filed a complaint in the District Court for the Western District of Missouri challenging, as unconstitutional, several sections of the Missouri statutes regulating the performance of abortions. The sections relevant here include Mo. Rev. Stat. § 188.025 (Supp. 1982), requiring that abortions after 12 weeks of pregnancy be performed in a hospital;[1] § 188.047, requiring a pathology report for each abortion performed;[2] § 188.030.3, requiring the presence of a second

and Against Sterilization Abuse et al.; and by *James Bopp, Jr.,* for the National Right to Life Committee, Inc.

Briefs of *amici curiae* were filed by *Solicitor General Lee, Assistant Attorney General McGrath,* and *Deputy Solicitor General Geller* for the United States; by *Alan Ernest* for the Legal Defense Fund for Unborn Children; by *Judith Levin* for the National Abortion Federation; by *Phyllis N. Segal, Judith I. Avner,* and *Jemera Rone* for the National Organization for Women; by *Eve W. Paul* and *Dara Klassel* for the Planned Parenthood Federation of America, Inc., et al.; by *Nancy Reardan* for Women Lawyers of Sacramento et al.; and by *Susan Frelich Appleton* and *Paul Brest* for Professor Richard L. Abel et al.

[1] Missouri Rev. Stat. § 188.025 (Supp. 1982) provides: "Every abortion performed subsequent to the first twelve weeks of pregnancy shall be performed in a hospital."

[2] Missouri Rev. Stat. § 188.047 (Supp. 1982) provides:

"A representative sample of tissue removed at the time of abortion shall be submitted to a board eligible or certified pathologist, who shall file a

physician during abortions performed after viability;[3] and § 188.028, requiring minors to secure parental or judicial consent.[4]

---

copy of the tissue report with the state division of health, and who shall provide a copy of the report to the abortion facility or hospital in which the abortion was performed or induced and the pathologist's report shall be made a part of the patient's permanent record."

[3] Missouri Rev. Stat. § 188.030.3 (Supp. 1982) provides:

"An abortion of a viable unborn child shall be performed or induced only when there is in attendance a physician other than the physician performing or inducing the abortion who shall take control of and provide immediate medical care for a child born as a result of the abortion. During the performance of the abortion, the physician performing it, and subsequent to the abortion, the physician required by this section to be in attendance, shall take all reasonable steps in keeping with good medical practice, consistent with the procedure used, to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman."

[4] Missouri Rev. Stat. § 188.028 (Supp. 1982) provides:

"1. No person shall knowingly perform an abortion upon a pregnant woman under the age of eighteen years unless:

"(1) The attending physician has secured the informed written consent of the minor and one parent or guardian; or

"(2) The minor is emancipated and the attending physician has received the informed written consent of the minor; or

"(3) The minor has been granted the right to self-consent to the abortion by court order pursuant to subsection 2 of this section, and the attending physician has received the informed written consent of the minor; or

"(4) The minor has been granted consent to the abortion by court order, and the court has given its informed written consent in accordance with subsection 2 of this section, and the minor is having the abortion willingly, in compliance with subsection 3 of this section.

"2. The right of a minor to self-consent to an abortion under subdivision (3) of subsection 1 of this section or court consent under subdivision (4) of subsection 1 of this section may be granted by a court pursuant to the following procedures:

"(1) The minor or next friend shall make an application to the juvenile court which shall assist the minor or next friend in preparing the petition and notices required pursuant to this section. The minor or the next friend of the minor shall thereafter file a petition setting forth the initials of the minor; the age of the minor; the names and addresses of each parent,

After hearing testimony from a number of expert witnesses, the District Court invalidated all of these sections except the pathology requirement. 483 F. Supp. 679, 699–701 (1980).[5] The Court of Appeals for the Eighth Circuit

guardian, or, if the minor's parents are deceased and no guardian has been appointed, any other person standing in loco parentis of the minor; that the minor has been fully informed of the risks and consequences of the abortion; that the minor is of sound mind and has sufficient intellectual capacity to consent to the abortion; that, if the court does not grant the minor majority rights for the purpose of consent to the abortion, the court should find that the abortion is in the best interest of the minor and give judicial consent to the abortion; that the court should appoint a guardian ad litem of the child; and if the minor does not have private counsel, that the court should appoint counsel. The petition shall be signed by the minor or the next friend;

. . . . .

"(3) A hearing on the merits of the petition, to be held on the record, shall be held as soon as possible within five days of the filing of the petition. . . . At the hearing, the court shall hear evidence relating to the emotional development, maturity, intellect and understanding of the minor; the nature, possible consequences, and alternatives to the abortion; and any other evidence that the court may find useful in determining whether the minor should be granted majority rights for the purpose of consenting to the abortion or whether the abortion is in the best interests of the minor;

"(4) In the decree, the court shall for good cause:

"(a) Grant the petition for majority rights for the purpose of consenting to the abortion; or

"(b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or

"(c) Deny the petition, setting forth the grounds on which the petition is denied;

. . . . .

"3. If a minor desires an abortion, then she shall be orally informed of and, if possible, sign the written consent required by section 188.039 in the same manner as an adult person. No abortion shall be performed on any minor against her will, except that an abortion may be performed against the will of a minor pursuant to a court order described in subdivision (4) of subsection 1 of this section that the abortion is necessary to preserve the life of the minor."

[5] The District Court also awarded attorney's fees for all hours claimed by the plaintiffs' attorneys. The Court of Appeals affirmed this allocation of

reversed the District Court's judgment with respect to § 188.028, thereby upholding the requirement that a minor secure parental or judicial consent to an abortion. It also held that the District Court erred in sustaining § 188.047, the pathology requirement. The District Court's judgment with respect to the second-physician requirement was affirmed, and the case was remanded for further proceedings and findings relating to the second-trimester hospitalization requirement. 655 F. 2d 848, 872–873 (1981). On remand, the District Court adhered to its holding that the second-trimester hospitalization requirement was unconstitutional. The Court of Appeals affirmed this judgment. 664 F. 2d 687, 691 (1981). We granted certiorari. 456 U. S. 988 (1982).

The Court today in *City of Akron, ante,* at 426–431, has stated fully the principles that govern judicial review of state statutes regulating abortions, and these need not be repeated here. With these principles in mind, we turn to the statutes at issue.

## II

In *City of Akron,* we invalidated a city ordinance requiring physicians to perform all second-trimester abortions at general or special hospitals accredited by the Joint Commission on Accreditation of Hospitals (JCAH) or by the American Osteopathic Association. *Ante,* at 431–432. Missouri's hospitalization requirements are similar to those enacted by Akron, as all second-trimester abortions must be performed in general, acute-care facilities.[6] For the reasons stated in *City of*

---

fees. See 655 F. 2d 848, 872 (CA8 1981). The petition for certiorari raises the issue whether an award of attorney's fees, made pursuant to 42 U. S. C. § 1988 (1976 ed., Supp. V), should be proportioned to reflect the extent to which plaintiffs prevailed.

[6] Missouri does not define the term "hospital" in its statutory provisions regulating abortions. We therefore must assume, as did the courts below, see 483 F. Supp. 679, 686, n. 10 (1980); 664 F. 2d 687, 689–690, and nn. 3, 5, and 6 (1981), that the term has its common meaning of a general, acute-

*Akron,* we held that such a requirement "unreasonably infringes upon a woman's constitutional right to obtain an abortion." *Ante,* at 439. For the same reasons, we affirm the Court of Appeals' judgment that § 188.025 is unconstitutional.

## III

We turn now to the State's second-physician requirement. In *Roe* v. *Wade,* 410 U. S. 113 (1973), the Court recognized that the State has a compelling interest in the life of a viable fetus: "[T]he State in promoting its interest in the potentiality of human life may, if it chooses, regulate, and even proscribe, abortion except where it is necessary, in appropriate medical judgment, for the preservation of the life or health of the mother." *Id.,* at 164–165. See *Colautti* v. *Franklin,* 439 U. S. 379, 386–387 (1979); *Beal* v. *Doe,* 432 U. S. 438, 445–446 (1977). Several of the Missouri statutes undertake such regulation. Postviability abortions are proscribed except when necessary to preserve the life or the health of the woman. Mo. Rev. Stat. § 188.030.1 (Supp. 1982). The

---

care facility. Cf. Mo. Rev. Stat. § 188.015(2) (Supp. 1982) (defining "abortion facility" as "a clinic, physician's office, or any other place or facility in which abortions are performed other than a hospital"). Section 197.020.2 (1978), part of Missouri's hospital licensing laws, reads:

"'Hospital' means a place devoted primarily to the maintenance and operation of facilities for the diagnosis, treatment or care for not less than twenty-four hours in any week of three or more nonrelated individuals suffering from illness, disease, injury, deformity or other abnormal physical conditions; or a place devoted primarily to provide for not less than twenty-four hours in any week medical . . . care for three or more nonrelated individuals. . . ."

Cf. Mo. Rev. Stat. § 197.200(1) (1978) (defining "ambulatory surgical center" to include facilities "with an organized medical staff of physicians" and "with continuous physician services and registered professional nursing services whenever a patient is in the facility"); 13 Mo. Admin. Code § 50–30.010(1)(A) (1977) (same). The regulations for the Department of Social Services establish standards for the construction, physical facilities, and administration of hospitals. §§ 50–20.010 to 50–20.030. These are not unlike those set by JCAH. See *City of Akron, ante,* at 432, and n. 16.

State also forbids the use of abortion procedures fatal to the viable fetus unless alternative procedures pose a greater risk to the health of the woman. § 188.030.2.

The statutory provision at issue in this case requires the attendance of a second physician at the abortion of a viable fetus. § 188.030.3. This section requires that the second physician "take all reasonable steps in keeping with good medical practice . . . to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman." See n. 3, *supra*. It also provides that the second physician "shall take control of and provide immediate medical care for a child born as a result of the abortion."

The lower courts invalidated § 188.030.3.[7] The plaintiffs, respondents here on this issue, urge affirmance on the

---

[7] The courts below found, and JUSTICE BLACKMUN's partial dissenting opinion agrees, *post*, at 499–500, that there is no possible justification for a second-physician requirement whenever D&E is used because no viable fetus can survive a D&E procedure. 483 F. Supp., at 694; 655 F. 2d, at 865. Accordingly, for them, § 188.030.3 is overbroad. This reasoning rests on two assumptions. First, a fetus cannot survive a D&E abortion, and second, D&E is the method of choice in the third trimester. There is general agreement as to the first proposition, but not as to the second. Indeed, almost all of the authorities disagree with JUSTICE BLACKMUN's critical assumption, and as the Court of Appeals noted, the choice of this procedure after viability is subject to the requirements of § 188.030.2. See *id.*, at 865, and n. 28. Nevertheless, the courts below, in conclusory language, found that D&E is the "method of choice even after viability is possible." *Id.*, at 865. No scholarly writing supporting this view is cited by those courts or by the partial dissent. Reliance apparently is placed solely on the testimony of Dr. Robert Crist, a physician from Kansas, to whom the District Court referred in a footnote. 483 F. Supp., at 694, n. 25. This testimony provides slim support for this holding. Dr. Crist's testimony, if nothing else, is remarkable in its candor. He is a member of the National Abortion Federation, "an organization of abortion providers and people interested in the pro-choice movement." 3 Record 415–416. He supported the use of D&E on 28-week pregnancies, well into the third trimester. In some circumstances, he considered it a better procedure than other methods. See *id.*, at 427–428. His disinterest in protecting fetal life is evidenced by his

484

grounds that the second-physician requirement distorts the traditional doctor-patient relationship, and is both impractical and costly. They note that Missouri does not require two

agreement "that the abortion patient has a right not only to be rid of the growth, called a fetus in her body, but also has a right to a dead fetus." *Id.*, at 431. He also agreed that he "[n]ever ha[s] any intention of trying to protect the fetus, if it can be saved," *ibid.*, and finally that "as a general principle" "[t]here should not be a live fetus," *id.*, at 435. Moreover, contrary to every other view, he thought a fetus could survive a D&E abortion. *Id.*, at 433–434. None of the other physicians who testified at the trial, those called both by the plaintiffs and defendants, considered that *any* use of D&E after viability was indicated. See 2 Record 21 (limiting use of D&E to under 18 weeks); 3 Record 381, 410–413 (Dr. Robert Kretzschmar) (D&E up to 17 weeks; would never perform D&E after 26 weeks); 5 Record 787 (almost "inconceivable" to use D&E after viability); 7 Record 52 (D&E safest up to 18 weeks); *id.*, at 110 (doctor not performing D&E past 20 weeks); *id.*, at 111 (risks of doing outpatient D&E equivalent to childbirth at 24 weeks). See also 8 Record 33, 78–81 (deposition of Dr. Willard Cates) (16 weeks latest D&E performed). Apparently Dr. Crist performed abortions only in Kansas, 3 Record 334, 368, 428, a State having no statutes comparable to § 188.030.1 and § 188.030.2. It is not clear whether he was operating under or familiar with the limitations imposed by Missouri law. Nor did he explain the circumstances when there were "contraindications" against the use of any of the procedures that could preserve viability, or whether his conclusory opinion was limited to emergency situations. Indeed, there is no record evidence that D&E ever will be the method that poses the least risk to the woman in those rare situations where there are compelling medical reasons for performing an abortion after viability. If there were such instances, they hardly would justify invalidating § 188.030.3.

In addition to citing Dr. Crist in its footnote, the District Court cited—with no elaboration—Dr. Schmidt. His testimony, reflecting no agreement with Dr. Crist, is enlightening. Although he conceded that the attendance of a second physician for a D&E abortion on a viable fetus was not necessary, he considered the point mostly theoretical, because he "simply [did] not believe that the question of viability comes up when D&E is an elected method of abortion." 5 Record 836. When reminded of Dr. Crist's earlier testimony, he conceded the remote possibility of third-trimester D&E abortions, but stated: "I personally cannot conceive that as a significant practical point. It may be important legally, but [not] from a medical standpoint . . . ." *Ibid.* Given that Dr. Crist's discordant testi-

physicians in attendance for any other medical or surgical procedure, including childbirth or delivery of a premature infant.

The first physician's primary concern will be the life and health of the woman. Many third-trimester abortions in Missouri will be emergency operations,[8] as the State permits these late abortions only when they are necessary to preserve the life or the health of the woman. It is not unreasonable for the State to assume that during the operation the first physician's attention and skills will be directed to preserving the woman's health, and not to protecting the actual life of those fetuses who survive the abortion procedure. Viable fetuses will be in immediate and grave danger because of their premature birth. A second physician, in situations where Missouri permits third-trimester abortions, may be of assistance to the woman's physician in preserving the health and life of the child.

By giving immediate medical attention to a fetus that is delivered alive, the second physician will assure that the State's interests are protected more fully than the first physician alone would be able to do. And given the compelling interest that the State has in preserving life, we cannot say that the Missouri requirement of a second physician in those un-

---

mony is wholly unsupported, the State's compelling interest in protecting a viable fetus justifies the second-physician requirement even though there may be the rare case when a physician may think honestly that D&E is required for the mother's health. Legislation need not accommodate every conceivable contingency.

[8] There is no clearly expressed exception on the face of the statute for the performance of an abortion of a viable fetus without the second physician in attendance. There may be emergency situations where, for example, the woman's health may be endangered by delay. Section § 188.030.3 is qualified, at least in part, by the phrase "provided that it does not pose an increased risk to the life or health of the woman." This clause reasonably could be construed to apply to such a situation. Cf. *H. L.* v. *Matheson,* 450 U. S. 398, 407, n. 14 (1981) (rejecting argument that Utah statute might apply to individuals with emergency health care needs).

486

usual circumstances where Missouri permits a third-trimester abortion is unconstitutional. Preserving the life of a viable fetus that is aborted may not often be possible,[9] but the State legitimately may choose to provide safeguards for the comparatively few instances of live birth that occur. We believe the second-physician requirement reasonably furthers the State's compelling interest in protecting the lives of viable fetuses, and we reverse the judgment of the Court of Appeals holding that § 188.030.3 is unconstitutional.

IV

In regulating hospital services within the State, Missouri requires that "[a]ll tissue surgically removed with the exception of such tissue as tonsils, adenoids, hernial sacs and prepuces, shall be examined by a pathologist, either on the premises or by arrangement outside of the hospital." 13 Mo. Admin. Code § 50–20.030(3)(A)7 (1977). With respect to abortions, whether performed in hospitals or in some other facility, § 188.047 requires the pathologist to "file a copy of the tissue report with the state division of health . . . ." See n. 2, *supra*. The pathologist also is required to "provide a copy of the report to the abortion facility or hospital in which the abortion was performed or induced." Thus, Missouri appears to require that tissue following abortions, as well as from almost all other surgery performed in hospitals, must be submitted to a pathologist, not merely examined by the performing doctor. The narrow question before us is whether the State lawfully also may require the tissue removed fol-

---

[9] See American College of Obstetricians and Gynecologists (ACOG) Technical Bulletin No. 56, p. 4 (Dec. 1979) (as high as 7% live-birth rate for intrauterine instillation of uterotonic agents); Stroh & Hinman, Reported Live Births Following Induced Abortion: Two and One-Half Years' Experience in Upstate New York, 126 Am. J. Obstet. Gynecol. 83, 83–84 (1976) (26 live births following saline induced-abortions; 9 following hysterotomy; 1 following oxtyocin-induced abortion) (1 survival out of 38 live births); 5 Record 728 (50–62% mortality rate for fetuses 26 and 27 weeks); *id.*, at 729 (25–92% mortality rate for fetuses 28 and 29 weeks); *id.*, at 837 (50% mortality rate at 34 weeks).

lowing abortions performed in clinics as well as in hospitals to be submitted to a pathologist.

On its face and in effect, § 188.047 is reasonably related to generally accepted medical standards and "further[s] important health-related state concerns." *City of Akron, ante,* at 430. As the Court of Appeals recognized, pathology examinations are clearly "useful and even necessary in some cases," because "abnormalities in the tissue may warn of serious, possibly fatal disorders." 655 F. 2d, at 870.[10] As a rule, it is accepted medical practice to submit *all* tissue to the examination of a pathologist.[11] This is particularly important following abortion, because questions remain as to the long-range

[10] A pathological examination is designed to assist in the detection of fatal ectopic pregnancies, hydatidiform moles or other precancerous growths, and a variety of other problems that can be discovered only through a pathological examination. The general medical utility of pathological examinations is clear. See, *e. g.,* ACOG, Standards for Obstetric-Gynecologic Services 52 (5th ed. 1982) (1982 ACOG Standards); National Abortion Federation (NAF) Standards 6 (1981) (compliance with standards obligatory for NAF member facilities to remain in good standing); Brief for American Public Health Association as *Amicus Curiae,* O. T. 1982, Nos. 81–185, 81–746, 81–1172, p. 29, n. 6 (supporting the NAF standards for nonhospital abortion facilities as constituting "minimum standards").

[11] ACOG's standards at the time of the District Court's trial recommended that a "tissue or operative review committee" should examine "all tissue removed at obstetric-gynecologic operations." ACOG, Standards for Obstetric-Gynecologic Services 13 (4th ed. 1974). The current ACOG Standards also state as a general rule that, for all surgical services performed on an ambulatory basis, "[t]issue removed should be submitted to a pathologist for examination." 1982 ACOG Standards, at 52. JUSTICE BLACKMUN's partial dissent, however, relies on the recent modification of these Standards as they apply to abortions. ACOG now provides an "exception to the practice" of mandatory examination by a pathologist and makes such examination for abortion tissue permissive. *Ibid.* Not surprisingly, this change in policy was controversial within the College. See 5 Record 799–800. ACOG found that "[n]o consensus exists regarding routine microscopic examination of aspirated tissue in every case," though it recognized—on the basis of inquiries made in 29 institutions—that in a majority of them a microscopic examination is performed in all cases. ACOG, Report of Committee on Gynecologic Practice, Item #6.2.1 (June 27–28, 1980).

complications and their effect on subsequent pregnancies. See App. 72–73 (testimony of Dr. Willard Cates, Jr.); Levin, Schoenbaum, Monson, Stubblefield, & Ryan, Association of Induced Abortion with Subsequent Pregnancy Loss, 243 J. A. M. A. 2495, 2499 (1980). Recorded pathology reports, in concert with abortion complication reports, provide a statistical basis for studying those complications. Cf. *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 81 (1976).

Plaintiffs argue that the physician performing the abortion is as qualified as a pathologist to make the examination. This argument disregards the fact that Missouri requires a pathologist—not the performing physician—to examine tissue after almost every type of surgery. Although this requirement is in a provision relating to surgical procedures in hospitals, many of the same procedures included within the Missouri statute customarily are performed also in outpatient clinics. No reason has been suggested why the prudence required in a hospital should not be equally appropriate in such a clinic. Indeed, there may be good reason to impose stricter standards in this respect on clinics performing abortions than on hospitals.[12] As the testimony in the District

---

[12] The professional views that the plaintiffs find to support their position do not disclose whether consideration was given to the fact that not all abortion clinics, particularly inadequately regulated clinics, conform to ethical or generally accepted medical standards. See *Bellotti* v. *Baird*, 443 U. S. 622, 641, n. 21 (1979) *(Bellotti II)* (minors may resort to "incompetent or unethical" abortion clinics); *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 91, n. 2 (1976) (Stewart, J., concurring). The Sun-Times of Chicago, in a series of special reports, disclosed widespread questionable practices in abortion clinics in Chicago, including the failure to obtain proper pathology reports. See The Abortion Profiteers, Chicago Sun-Times 25–26 (Special Reprint 1978). It is clear, therefore, that a State reasonably could conclude that a pathology requirement is necessary in abortion clinics as well as in general hospitals.

In suggesting that we make from a "comfortable perspective" the judgment that a State constitutionally can require the additional cost of a pathology examination, JUSTICE BLACKMUN's partial dissent suggests that we

Court indicates, medical opinion differs widely on this question. See 4 Record 623; 5 Record 749–750, 798–800, 845–847; n. 11, *supra*. There is substantial support for Missouri's requirement. In this case, for example, Dr. Bernard Nathanson, a widely experienced abortion practitioner, testified that he requires a pathologist examination after each of the 60,000 abortions performed under his direction at the New York Center for Reproductive and Sexual Health. He considers it "absolutely necessary to obtain a pathologist's report on each and every specimen of tissue removed from abortion or for that matter from any other surgical procedure which involves the removal of tissue from the human body." App. 143–144. See also *id.*, at 146–147 (testimony of Dr. Keitges); 5 Record 798–799 (testimony of Dr. Schmidt).[13]

In weighing the balance between protection of a woman's health and the comparatively small additional cost of a pathologist's examination, we cannot say that the Constitution requires that a State subordinate its interest in health to minimize to this extent the cost of abortions. Even in the early weeks of pregnancy, "[c]ertain regulations that have no significant impact on the woman's exercise of her right [to

disregard the interests of the "woman on welfare or the unemployed teenager." *Post*, at 498. But these women may be those most likely to seek the least expensive clinic available. As the standards of medical practice in such clinics may not be the highest, a State may conclude reasonably that a pathologist's examination of tissue is particularly important for their protection.

[13] JUSTICE BLACKMUN's partial dissent appears to suggest that § 188.047 is constitutionally infirm because it does not require microscopic examination, *post*, at 496–497, but that misses the point of the regulation. The need is for someone other than the performing clinic to make an independent medical judgment on the tissue. See n. 12, *supra;* 5 Record 750 (Dr. Pierre Keitges, a pathologist). It is reasonable for the State to assume that an independent pathologist is more likely to perform a microscopic examination than the performing doctor. See H. Cove, Surgical Pathology of the Endometrium 28 (1981) ("To the pathologist, abortions of any sort are evaluated grossly *and* microscopically for the primary purpose of establishing a diagnosis of intrauterine pregnancy") (emphasis added).

decide to have an abortion] may be permissible where justified by important state health objectives." *City of Akron, ante,* at 430. See *Danforth, supra,* at 80–81. We think the cost of a tissue examination does not significantly burden a pregnant woman's abortion decision. The estimated cost of compliance for plaintiff Reproductive Health Services was $19.40 per abortion performed, 483 F. Supp., at 700, n. 48, and in light of the substantial benefits that a pathologist's examination can have, this small cost clearly is justified. In *Danforth,* this Court unanimously upheld Missouri's record-keeping requirement as "useful to the State's interest in protecting the health of its female citizens, and [as] a resource that is relevant to decisions involving medical experience and judgment," 428 U. S., at 81.[14] We view the requirement for a pathology report as comparable and as a relatively insignificant burden. Accordingly, we reverse the judgment of the Court of Appeals on this issue.

## V

As we noted in *City of Akron,* the relevant legal standards with respect to parental-consent requirements are not in dispute. See *ante,* at 439; *Bellotti* v. *Baird,* 443 U. S. 622, 640–642, 643–644 (1979) *(Bellotti II)* (plurality opinion); *id.,* at 656–657 (WHITE, J., dissenting).[15] A State's interest in

---

[14] The *Danforth* Court also noted that "[t]he added requirements for confidentiality, with the sole exception for public health officers, and for retention for seven years, a period not unreasonable in length, assist and persuade us in our determination of the constitutional limits." 428 U. S., at 81. Missouri extends the identical safeguards found reassuring in *Danforth* to the pathology reports at issue here. See Mo. Rev. Stat. §§ 188.055.2, 188.060 (Supp. 1982).

[15] The dissenters apparently believe that the issue here is an open one, and adhere to the views they expressed in *Bellotti II. Post,* at 503–504. But those views have never been adopted by a majority of this Court, while a majority have expressed quite differing views. See *H. L.* v. *Matheson,* 450 U. S. 398 (1981); *Bellotti II* (plurality opinion); 443 U. S., at 656–657 (WHITE, J., dissenting).

protecting immature minors will sustain a requirement of a consent substitute, either parental or judicial. It is clear, however, that "the State must provide an alternative procedure whereby a pregnant minor may demonstrate that she is sufficiently mature to make the abortion decision herself or that, despite her immaturity, an abortion would be in her best interests."[16] *City of Akron, ante*, at 439–440.[17] The issue here is one purely of statutory construction: whether Mis-

[16] The plurality in *Bellotti II* also required that the alternative to parental consent must "assure" that the resolution of this issue "will be completed with anonymity and sufficient expedition to provide an effective opportunity for an abortion to be obtained." *Id.*, at 644. Confidentiality here is assured by the statutory requirement that allows the minor to use her initials on the petition. Mo. Rev. Stat. § 188.028.2(1) (Supp. 1982). As to expedition of appeals, § 188.028.2(6) provides in relevant part:

"The notice of intent to appeal shall be given within twenty-four hours from the date of issuance of the order. The record on appeal shall be completed and the appeal shall be perfected within five days from the filing of notice to appeal. Because time may be of the essence regarding the performance of the abortion, the supreme court of this state shall, by court rule, provide for expedited appellate review of cases appealed under this section."

We believe this section provides the framework for a constitutionally sufficient means of expediting judicial proceedings. Immediately after the effective date of this statutory enactment, the District Court enjoined enforcement. No unemancipated pregnant minor has been required to comply with this section. Thus, to this point in time, there has been no need for the State Supreme Court to promulgate rules concerning appellate review. There is no reason to believe that Missouri will not expedite any appeal consistent with the mandate in our prior opinions.

[17] Cf. *H. L. v. Matheson, supra*, at 406–407, and n. 14, 411 (upholding a parental notification requirement but not extending the holding to mature or emancipated minors or to immature minors showing such notification detrimental to their best interests). The lower courts found that § 188.028's notice requirement was unconstitutional. 655 F. 2d, at 873; 483 F. Supp., at 701. The State has not sought review of that judgment here. Thus, in the posture in which it appears before this Court for review, § 188.028 contains no requirement for parental notification.

souri provides a judicial alternative that is consistent with these established legal standards.[18]

The Missouri statute, § 188.028.2,[19] in relevant part, provides:

"(4) In the decree, the court shall for good cause:

"(a) Grant the petition for majority rights for the purpose of consenting to the abortion; or

"(b) Find the abortion to be in the best interests of the minor and give judicial consent to the abortion, setting forth the grounds for so finding; or

"(c) Deny the petition, setting forth the grounds on which the petition is denied."

On its face, § 188.028.2(4) authorizes Juvenile Courts[20] to choose among any of the alternatives outlined in the section.

---

[18] The Missouri statute also exempts "emancipated" women under the age of 18 both from the requirement of parental consent and from the alternative requirement of a judicial proceeding. Plaintiffs argue that the word "emancipated" in this context is void for vagueness, but we disagree. Cf. *H. L.* v. *Matheson, supra,* at 407 (using word to describe a minor). Although the question whether a minor is emancipated turns upon the facts and circumstances of each individual case, the Missouri courts have adopted general rules to guide that determination, and the term is one of general usage and understanding in the Missouri common law. See *Black* v. *Cole,* 626 S. W. 2d 397, 398 (Mo. App. 1981) (quoting 67 C. J. S., Parent and Child § 86, p. 811 (1950)); *In re Marriage of Heddy,* 535 S. W. 2d 276, 279 (Mo. App. 1976) (same); *Wurth* v. *Wurth,* 313 S. W. 2d 161, 164 (Mo. App. 1958) (same), rev'd on other grounds, 322 S. W. 2d 745 (Mo. 1959).

[19] See n. 4, *supra.* This Court in *Danforth* held unconstitutional Missouri's parental-consent requirement for all unmarried minors under the age of 18. 428 U. S., at 75. In response to our decision, Missouri enacted the section challenged here. This new statute became effective shortly before our decision in *Bellotti II.*

[20] We have indicated in prior opinions that a minor should have access to an "independent decisionmaker." *H. L.* v. *Matheson, supra,* at 420 (POWELL, J., concurring). Missouri has provided for a judicial decisionmaker. We therefore need not consider whether a qualified and independent nonjudicial decisionmaker would be appropriate. Cf. *Bellotti II,* 443 U.S., at 643, n. 22.

The Court of Appeals concluded that a denial of the petition permitted in subsection (c) "would initially require the court to find that the minor was not emancipated and was not mature enough to make her own decision and that an abortion was not in her best interests." 655 F. 2d, at 858. Plaintiffs contend that this interpretation is unreasonable. We do not agree.

Where fairly possible, courts should construe a statute to avoid a danger of unconstitutionality. The Court of Appeals was aware, if the statute provides discretion to deny permission to a minor for *any* "good cause," that arguably it would violate the principles that this Court has set forth. *Ibid.* It recognized, however, that before exercising any option, the Juvenile Court must receive evidence on "the emotional development, maturity, intellect and understanding of the minor." Mo. Rev. Stat. § 188.028.2(3) (Supp. 1982). The court then reached the logical conclusion that "findings and the ultimate denial of the petition must be supported by a showing of 'good cause.'" 655 F. 2d, at 858. The Court of Appeals reasonably found that a court could not deny a petition "for good cause" unless it first found—after having received the required evidence—that the minor was not mature enough to make her own decision. See *Bellotti II*, 443 U. S., at 643–644, 647–648 (plurality opinion). We conclude that the Court of Appeals correctly interpreted the statute and that § 188.028, as interpreted, avoids any constitutional infirmities.[21]

---

[21] Plaintiffs also argue that, in light of the ambiguity of § 188.028.2(4), as evidenced by the differing interpretations placed upon it, the appropriate course of judicial restraint is abstention. This Court has found such an approach appropriate. See *Bellotti* v. *Baird*, 428 U. S. 132, 146–147 (1976) *(Bellotti I)*. Plaintiffs did not, however, argue in the Court of Appeals that the court should abstain, and Missouri has no certification procedure whereby this Court can refer questions of state statutory construction to the State Supreme Court. See 655 F. 2d, at 861, n. 20; 17 C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure § 4248, p. 525, n. 29 (1978 and Supp. 1982). Such a procedure "greatly simplifie[d]" our

## VI

The judgment of the Court of Appeals, insofar as it invalidated Missouri's second-trimester hospitalization requirement and upheld the State's parental- and judicial-consent provision, is affirmed. The judgment invalidating the requirement of a pathology report for all abortions and the requirement that a second physician attend the abortion of any viable fetus is reversed. We vacate the judgment upholding an award of attorney's fees for all hours expended by plaintiffs' attorneys and remand for proceedings consistent with *Hensley* v. *Eckerhart*, 461 U. S. 424 (1983).

*It is so ordered.*

JUSTICE BLACKMUN, with whom JUSTICE BRENNAN, JUSTICE MARSHALL, and JUSTICE STEVENS join, concurring in part and dissenting in part.

The Court's decision today in *Akron* v. *Akron Center for Reproductive Health, Inc., ante,* p. 416, invalidates the city of Akron's hospitalization requirement and a host of other provisions that infringe on a woman's decision to terminate her pregnancy through abortion. I agree that Missouri's hospitalization requirement is invalid under the *Akron* analysis, and I join Parts I and II of JUSTICE POWELL's opinion in the present cases. I do not agree, however, that the remaining Missouri statutes challenged in these cases satisfy the constitutional standards set forth in *Akron* and the Court's prior decisions.

## I

Missouri law provides that whenever an abortion is performed, a tissue sample must be submitted to a "board eli-

---

analysis in *Bellotti I, supra,* at 151. Moreover, where, as here, a statute is susceptible to a fair construction that obviates the need to have the state courts render the saving construction, there is no reason for federal courts to abstain.

gible or certified pathologist" for a report. Mo. Rev. Stat. § 188.047 (Supp. 1982). This requirement applies to first-trimester abortions as well as to those performed later in pregnancy. Our past decisions establish that the performance of abortions during the first trimester must be left "'free of interference by the State.'" *Akron, ante,* at 430, quoting *Roe* v. *Wade,* 410 U. S. 113, 163 (1973). As we have noted in *Akron,* this does not mean that every regulation touching upon first-trimester abortions is constitutionally impermissible. But to pass constitutional muster, regulations affecting first-trimester abortions must "have no significant impact on the woman's exercise of her right" and must be "justified by important state health objectives." *Akron, ante,* at 430; see *ante,* at 489–490.

Missouri's requirement of a pathologist's report is not justified by important health objectives. Although pathology examinations may be "useful and even necessary in some cases," *ante,* at 487, Missouri requires more than a pathology examination and a pathology report; it demands that the examination be performed and the report prepared by a "board eligible or certified pathologist" rather than by the attending physician. Contrary to JUSTICE POWELL's assertion, *ibid.,* this requirement of a report by a pathologist is not in accord with "generally accepted medical standards." The routine and accepted medical practice is for the attending physician to perform a gross (visual) examination of any tissue removed during an abortion. Only if the physician detects abnormalities is there a need to send a tissue sample to a pathologist. The American College of Obstetricians and Gynecologists (ACOG) does not recommend an examination by a pathologist in every case:

> "In the situation of elective termination of pregnancy, the attending physician should record a description of the gross products. Unless definite embryonic or fetal parts can be identified, the products of elective interrup-

tions of pregnancy must be submitted to a pathologist for gross and microscopic examination.

· · · · ·

". . . Aspirated tissue should be examined to ensure the presence of villi or fetal parts prior to the patient's release from the facility. If villi or fetal parts are not identified with certainty, the tissue specimen must be sent for further pathologic examination . . . ." ACOG, Standards for Obstetric-Gynecologic Services 52, 54 (5th ed. 1982).[1]

Nor does the National Abortion Federation believe that such an examination is necessary:

"All tissue must be examined grossly at the time of the abortion procedure by a physician or trained assistant and the results recorded in the chart. In the absence of visible fetal parts or placenta upon gross examination, obtained tissue may be examined under a low power microscope for the detection of villi. If this examination is inconclusive, the tissue should be sent to the nearest suitable pathology laboratory for microscopic examination." National Abortion Federation Standards 6 (1981) (emphasis deleted).

As the Court of Appeals pointed out, there was expert testimony at trial that a nonpathologist physician is as capable of performing an adequate gross examination as is a pathologist, and that the "abnormalities which are of concern" are

---

[1] See also ACOG, Standards for Obstetric-Gynecologic Services 66 (1982):

"Tissue removed should be submitted to a pathologist for examination. . . . An exception to the practice may be in elective terminations of pregnancy in which definitive embryonic or fetal parts can be identified. In such instances, the physician should record a description of the gross products. Unless definite embryonic or fetal parts can be identified, the products of elective interruptions of pregnancy must be submitted to a pathologist for gross and microscopic examination."

readily detectable by a physician.    655 F. 2d 848, 871, n. 37 (CA8 1981); see App. 135.[2]    While a pathologist may be better able to perform a microscopic examination, Missouri law does not require a microscopic examination unless "fetal parts or placenta are not identified."    13 Mo. Admin. Code § 50–151.030(1) (1981).    Thus, the effect of the Missouri statute is to require a pathologist to perform the initial gross examination, which is normally the responsibility of the attending physician and which will often make the pathologist's services unnecessary.

On the record before us, I must conclude that the State has not "met its burden of demonstrating that [the pathologist requirement] further[s] important health-related State concerns." *Akron, ante,* at 430.[3]    There has been no showing that tissue examinations by a pathologist do more to protect health than examinations by a nonpathologist physician.    Missouri does not require pathologists' reports for any other surgical procedures performed in clinics, or for minor surgery performed in hospitals.    13 Mo. Admin. Code § 50–20.030(3)(A)(7) (1977).    Moreover, I cannot agree with JUSTICE POWELL that Missouri's pathologist requirement has "no significant impact" *ante,* at 489, on a woman's exercise of her right to an abortion.    It is undisputed that this requirement may increase the cost of a first-trimester abortion by as much as $40.    See 483 F. Supp. 679, 700, n. 48 (WD Mo. 1980).    Although this increase may seem insignificant from the Court's comfortable perspective, I cannot say that it is equally insignificant to every woman seeking an abortion.

---

[2] The District Court made no findings on this point, noting only that some witnesses for the State had testified that "pathology should be done" for every abortion.    483 F. Supp. 679, 700, n. 49 (WD Mo. 1980).

[3] JUSTICE POWELL appears to draw support from the facts that "questionable practices" occur at some abortion clinics, while at others "the standards of medical practice . . . may not be the highest." *Ante,* at 489, n. 12.    There is no evidence, however, that such questionable practices occur in Missouri.

For the woman on welfare or the unemployed teenager, this additional cost may well put the price of an abortion beyond reach.[4]    Cf. *Harper* v. *Virginia Board of Elections*, 383 U. S. 663, 668 (1966) ($1.50 poll tax "excludes those unable to pay"); *Burns* v. *Ohio*, 360 U. S. 252, 255, 257 (1959) ($20 docket fee "foreclose[s] access" to appellate review for indigents).

In *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S. 52, 81 (1976), the Court warned that the minor recordkeeping requirements upheld in that case "perhaps approach[ed] impermissible limits."    Today in *Akron*, we have struck down restrictions on first-trimester abortions that "may in some cases add to the cost of providing abortions."    *Ante*, at 447–448; see *ante*, at 449–451.    Missouri's requirement of a pathologist's report unquestionably adds significantly to the cost of providing abortions, and Missouri has not shown that it serves any substantial health-related purpose.    Under these circumstances, I would hold that constitutional limits have been exceeded.

## II

In Missouri, an abortion may be performed after viability only if necessary to preserve the life or health of the woman.    Mo. Rev. Stat. § 188.030.1 (Supp. 1982).    When a postviability abortion is performed, Missouri law provides that "there [must be] in attendance a [second] physician . . . who

---

[4] A $40 pathologist's fee may increase the price of a first-trimester abortion by 20% or more.    See 655 F. 2d 848, 869, n. 35 (1981) (cost of first-trimester abortion at Reproductive Health Services is $170); F. Jaffe, B. Lindheim, & P. Lee, Abortion Politics: Private Morality and Public Policy 36 (1981) (cost of first-trimester clinic abortion ranges from approximately $185 to $235); Henshaw, Freestanding Abortion Clinics: Services, Structure, Fees, 14 Family Planning Perspectives 248, 255 (1982) (average cost of first-trimester clinic abortion is $190); National Abortion Federation Membership Directory 18–19 (1982/1983) (NAF clinics in Missouri charge $180 to $225 for first-trimester abortion).

shall take control of and provide immediate medical care for a child born as a result of the abortion." Mo. Rev. Stat. § 188.030.3 (Supp. 1982). The Court recognized in *Roe* v. *Wade*, 410 U. S., at 164–165, that a State's interests in preserving maternal health and protecting the potentiality of human life may justify regulation and even prohibition of postviability abortions, except those necessary to preserve the life and health of the mother. But regulations governing postviability abortions, like those at any other stage of pregnancy, must be "tailored to the recognized state interests." *Id.*, at 165; see *H. L.* v. *Matheson*, 450 U. S. 398, 413 (1981) ("statute plainly serves important state interests, [and] is narrowly drawn to protect only those interests"); *Roe*, 410 U. S., at 155 ("legislative enactments must be narrowly drawn to express only the legitimate state interests at stake").

### A

The second-physician requirement is upheld in these cases on the basis that it "reasonably furthers the State's compelling interest in protecting the lives of viable fetuses." *Ante*, at 486. While I agree that a second physician indeed may aid in preserving the life of a fetus born alive, this type of aid is possible only when the abortion method used is one that may result in a live birth. Although Missouri ordinarily requires a physician performing a postviability abortion to use the abortion method most likely to preserve fetal life, this restriction does not apply when this method "would present a greater risk to the life and health of the woman." Mo. Rev. Stat. § 188.030.2 (Supp. 1982).

The District Court found that the dilatation and evacuation (D&E) method of abortion entails no chance of fetal survival, and that it will nevertheless be the method of choice for some women who need postviability abortions. In some cases, in other words, maternal health considerations will preclude the use of procedures that might result in a live birth. 483

F. Supp., at 694.[5]   When a D&E abortion is performed, the second physician can do nothing to further the State's compelling interest in protecting potential life.   His presence is superfluous.   The second-physician requirement thus is overbroad and "imposes a burden on women in cases where the burden is not justified by any possibility of survival of the fetus."   655 F. 2d, at 865–866.

JUSTICE POWELL apparently believes that the State's interest in preserving potential life justifies the State in requiring a second physician at all postviability abortions because some methods other than D&E may result in live births. But this fact cannot justify requiring a second physician to attend an abortion at which the chance of a live birth is nonexistent.   The choice of method presumably will be made in advance,[6] and any need for a second physician disappears when

---

[5] The District Court relied on the testimony of Doctors Robert Crist and Richard Schmidt.   Doctor Crist testified that in some instances abortion methods other than D&E would be "absolutely contraindicated" by the woman's health condition, 3 Record 438–439, giving the example of a recent patient with hemolytic anemia that would have been aggravated by the use of prostaglandins or other labor-inducing abortion methods, id., at 428. Doctor Schmidt testified that "[t]here very well may be" situations in which D&E would be used because other methods were contraindicated. 5 Record 836.   Although Doctor Schmidt previously had testified that a postviability D&E abortion was "almost inconceivable," this was in response to a question by the State's attorney regarding whether D&E would be used "[a]bsent the possibility that there is extreme contraindication for the use of prostaglandins or saline, or of hysterotomy." Id., at 787.   Any inconsistencies in Doctor Schmidt's testimony apparently were resolved by the District Court in the plaintiffs' favor.

The Court of Appeals upheld the District Court's factual finding that health reasons sometimes would require the use of D&E for postviability abortions.   655 F. 2d, at 865.   Absent the most exceptional circumstances, we do not review a District Court's factual findings in which the Court of Appeals has concurred.   Branti v. Finkel, 445 U. S. 507, 512, n. 6 (1980).

[6] In addition to requiring the physician to select the method most likely to preserve fetal life, so long as it presents no greater risk to the pregnant woman, Missouri requires that the physician "certify in writing the avail-

the woman's health requires that the choice be D&E. Because the statute is not tailored to protect the State's legitimate interests, I would hold it invalid.[7]

## B

In addition, I would hold that the statute's failure to provide a clear exception for emergency situations renders it unconstitutional. As JUSTICE POWELL recognizes, *ante*, at 485, n. 8, an emergency may arise in which delay could be dangerous to the life or health of the woman. A second physician may not always be available in such a situation; yet the statute appears to require one. It states, in unqualified terms, that a postviability abortion *"shall* be performed . . . *only* when there is in attendance"* a second physician who *"shall* take control of"* any child born as a result of the abortion, and it imposes certain duties on "the physician *required* by this section to be in attendance." Mo. Rev. Stat. § 188.030.3 (Supp. 1982) (emphasis added). By requiring the attendance of a second physician even when the resulting delay may be harmful to the health of the pregnant woman, the statute impermissibly fails to make clear "that the woman's life and

able method or techniques considered and the reasons for choosing the method or technique employed." Mo. Rev. Stat. § 188.030.2 (Supp. 1982). This ensures that the choice of method will be a reasoned one.

[7] The State argues that its second-physician requirement is justified even when D&E is used, because "[i]f the statute specifically excepted D&E procedures, abortionists would be encouraged to use it more frequently to avoid the expense of a second physician, to ensure a dead fetus, to prevent the presence of a second professional to observe malpractice or the choice of a questionable procedure from a safety viewpoint, a fetus-destroying procedure, or to avoid their own awakening to concern for the newborn." Brief for Petitioners in No. 81–1623, p. 44. The Court rejected this purported justification for a second physician in *Doe* v. *Bolton,* 410 U. S. 179, 199 (1973): "If a physician is licensed by the State, he is recognized by the State as capable of exercising acceptable clinical judgment. If he fails in this, professional censure and deprivation of his license are available remedies. Required acquiescence by co-practitioners has no rational connection with a patient's needs and unduly infringes on the physician's right to practice."

health must always prevail over the fetus' life and health when they conflict." *Colautti* v. *Franklin,* 439 U. S. 379, 400 (1979).

JUSTICE POWELL attempts to cure this defect by asserting that the final clause of the statute, requiring the two physicians to "take all reasonable steps . . . to preserve the life and health of the viable unborn child; provided that it does not pose an increased risk to the life or health of the woman," could be construed to permit emergency postviability abortions without a second physician. *Ante,* at 485, n. 8. This construction is contrary to the plain language of the statute; the clause upon which JUSTICE POWELL relies refers to the duties of both physicians during the performance of the abortion, but it in no way suggests that the second physician may be dispensed with.

Moreover, since JUSTICE POWELL's proposed construction is not binding on the courts of Missouri,[8] a physician performing an emergency postviability abortion cannot rely on it with any degree of confidence. The statute thus remains impermissibly vague; it fails to inform the physician whether he may proceed with a postviability abortion in an emergency, or whether he must wait for a second physician even if the woman's life or health will be further imperiled by the delay. This vagueness may well have a severe chilling effect on the physician who perceives the patient's need for a postviability abortion. In *Colautti* v. *Franklin,* we considered a statute that failed to specify whether it "require[d] the physician to make a 'trade-off' between the woman's health and additional percentage points of fetal survival." 439 U. S., at 400. The Court held there that "where conflicting duties of this magnitude are involved, the State, at the least, must proceed with greater precision before it may subject a physician to possible

---

[8] "Only the [Missouri] courts can supply the requisite construction, since of course 'we lack jurisdiction authoritatively to construe state legislation.'" *Gooding* v. *Wilson,* 405 U. S. 518, 520 (1972), quoting *United States* v. *Thirty-seven Photographs,* 402 U. S. 363, 369 (1971).

criminal sanctions." *Id.*, at 400–401.[9] I would apply that reasoning here, and hold Missouri's second-physician requirement invalid on this ground as well.[10]

## III

Missouri law prohibits the performance of an abortion on an unemancipated minor absent parental consent or a court order. Mo. Rev. Stat. § 188.028 (Supp. 1982).

Until today, the Court has never upheld "a requirement of a consent substitute, either parental or judicial," *ante*, at 491. In *Planned Parenthood of Central Missouri* v. *Danforth*, 428 U. S., at 74, the Court invalidated a parental-consent requirement on the ground that "the State does not have the constitutional authority to give a third party an absolute, and possibly arbitrary, veto over the decision of the physician and his patient to terminate the patient's pregnancy, regardless of the reason for withholding the consent." In *Bellotti* v. *Baird*, 443 U. S. 622 (1979) *(Bellotti II)*, eight Justices

---

[9] A physician who fails to comply with Missouri's second-physician requirement faces criminal penalties and the loss of his license. Mo. Rev. Stat. §§ 188.065, 188.075 (1978 and Supp. 1982).

[10] Because I would hold the statute unconstitutional on these grounds, I do not reach the question whether Missouri's second-physician requirement impermissibly interferes with the doctor-patient relationship. I note, however, that Missouri does not require attendance of a second physician at any other medical procedure, including a premature birth. There was testimony at trial that a newborn infant, whether the product of a normal birth or an abortion, ordinarily remains the responsibility of the woman's physician until he turns its care over to another. App. 133; see ACOG, Standards for Obstetric-Gynecologic Services 31 (5th ed., 1982) ("The individual who delivers the baby is responsible for the immediate post-delivery care of the newborn until another person assumes this duty").

This allocation of responsibility makes sense. Consultation and teamwork are fundamental in medical practice, but in an operating room a patient's life or health may depend on split-second decisions by the physician. If responsibility and control must be shared between two physicians with the lines of authority unclear, precious moments may be lost to the detriment of both woman and child.

agreed that a Massachusetts statute permitting a judicial veto of a mature minor's decision to have an abortion was unconstitutional. See *id.*, at 649–650 (opinion of POWELL, J.); *id.*, at 654–656 (opinion of STEVENS, J.). Although four Justices stated in *Bellotti II* that an appropriately structured judicial-consent requirement would be constitutional, *id.*, at 647–648 (opinion of POWELL, J.), this statement was not necessary to the result of the case and did not command a majority. Four other Justices concluded that any judicial-consent statute would suffer from the same flaw the Court identified in *Danforth:* it would give a third party an absolute veto over the decision of the physician and his patient. 443 U. S., at 655–656 (opinion of STEVENS, J.).

I continue to adhere to the views expressed by JUSTICE STEVENS in *Bellotti II:*

"It is inherent in the right to make the abortion decision that the right may be exercised without public scrutiny and in defiance of the contrary opinion of the sovereign or other third parties. . . . As a practical matter, I would suppose that the need to commence judicial proceedings in order to obtain a legal abortion would impose a burden at least as great as, and probably greater than, that imposed on the minor child by the need to obtain the consent of the parent. Moreover, once this burden is met, the only standard provided for the judge's decision is the best interest of the minor. That standard provides little real guidance to the judge, and his decision must necessarily reflect personal and societal values and mores whose enforcement upon the minor—particularly when contrary to her own informed and reasonable decision— is fundamentally at odds with privacy interests underlying the constitutional protection afforded to her decision." *Ibid.* (footnote omitted).

Because Mo. Rev. Stat. § 188.028 (Supp. 1982) permits a parental or judicial veto of a minor's decision to obtain an abortion, I would hold it unconstitutional.

JUSTICE O'CONNOR, with whom JUSTICE WHITE and JUSTICE REHNQUIST join, concurring in the judgment in part and dissenting in part.

For reasons stated in my dissent in *Akron* v. *Akron Center for Reproductive Health, ante,* p. 416, I believe that the second-trimester hospitalization requirement imposed by § 188.025 does not impose an undue burden on the limited right to undergo an abortion. Assuming, *arguendo,* that the requirement was an undue burden, it would nevertheless "reasonably relat[e] to the preservation and protection of maternal health." *Roe* v. *Wade,* 410 U. S. 113, 163 (1973). I therefore dissent from the Court's judgment that the requirement is unconstitutional.

I agree that the second-physician requirement contained in § 188.030.3 is constitutional because the State possesses a compelling interest in protecting and preserving fetal life, but I believe that this state interest is extant throughout pregnancy. I therefore concur in the judgment of the Court.

I agree that the pathology-report requirement imposed by § 188.047 is constitutional because it imposes no undue burden on the limited right to undergo an abortion. Because I do not believe that the validity of this requirement is contingent in any way on the trimester of pregnancy in which it is imposed, I concur in the judgment of the Court.

Assuming, *arguendo,* that the State cannot impose a parental veto on the decision of a minor to undergo an abortion, I agree that the parental-consent provision contained in § 188.028 is constitutional. However, I believe that the provision is valid because it imposes no undue burden on any right that a minor may have to undergo an abortion. I concur in the judgment of the Court on this issue.

I also concur in the Court's decision to vacate and remand on the issue of attorney's fees in light of *Hensley* v. *Eckerhart,* 461 U. S. 424 (1983).