Ms. Caran Curry Prosecutor Coordinator Tower Building, Suite 750 Little Rock, Arkansas 72201
Dear Ms. Curry:
This is in response to your request for an opinion regarding Amendment 3 of 1988 ("An Amendment to Prevent Abortion Funding and to Restrict Abortion"), and the Sexual Assault Examination Reimbursement Program (A.C.A. 12-12-401, et seq.). You have asked the following specific question in this regard:
 Does the Amendment prohibit the State of Arkansas from paying for what is known as the `morning after pill' (Pregnancy Prophylaxis — Premarin, Ethinyl Estradiol, or DES) for sexual assault victims?
The text of the Constitutional Amendment is as follows:
 Section 1. No public funds will be used to pay for any abortion, except to save the mother's life.
 Section 2. The policy of Arkansas is to protect the life of every unborn child from conception until birth, to the extent permitted by the federal constitution.
 Section 3. This amendment will not affect contraceptives or require an appropriation of public funds.
The question, then, is whether payment for the "morning after pill" constitutes payment for an "abortion" for purposes of the foregoing constitutional prohibition.
While the status of the law in this area is by no means fully developed, there is authority for the proposition that the use of the term "abortion" does not ordinarily include the "morning after pill." The United States District Court for the Eastern District of Louisiana stated the following in rejecting an argument that a state statute regulating abortion was void for vagueness:
 The Act defines abortion as: `the deliberate termination of a human pregnancy after fertilization of a female ovum, by any person, including the pregnant woman herself with an intention other than to produce a live birth, or to remove a dead unborn child. La. Rev. Stat. Ann. 40:1299.35.1 (West Supp. 1979). Plaintiffs contend that this definition is impermissibly vague because it covers at least two methods of birth control, the intra-uterine device (IUD) and the `morning-after' pill. Both of these methods are deliberate attempts to terminate pregnancy after fertilization but before implantation. Plaintiffs argue that the Act is ambiguous because it includes certain birth control methods not normally thought of as abortion. . . . However, the Court has been unable to discern a definition of abortion that does not suffer from the same vagueness. The Act's definition, although somewhat ambiguous, would not mislead a person of ordinary intelligence. . . . Abortion, as it is commonly understood, does not include the IUD, the `morning-after' pill, or, for example, birth control pills.
Margaret S. v. Edwards, 488 F. Supp. 181, 190-191 (E.D.La. 1980), aff'd, 794 F.2d 994 (5th Cir. 1986). But cf. Planned Parenthood Ass'n of Kansas City v. Ashcroft, 483 F. Supp. 679, 684 n. 5 (W.D.Mo. 1980) (stating in response to defendant's argument that the "morning after pill" does not constitute abortion within the meaning of the Act in question: "However, the Act defines `abortion' as `the intentional destruction of the life of an embryo or fetus in his or her mother's womb or the intentional termination of the pregnancy of a mother with an intention other than to increase the probability of a live birth or to remove a dead or dying unborn child." (Emphasis in original.)), rev'd in part and aff'd in part on other grounds, 655 F.2d 848 (8th Cir. 1981); see also Planned Parenthood, Etc. v. Ashcroft, 664 F.2d 687
(8th Cir. 1981), aff'd, 462 U.S. 476 (1983). It is significant to note in this regard that the definition of "abortion" under the Louisiana statute is similar to that set forth in Arkansas Code Annotated 20-16-701 et seq., which places certain limitations upon the abortion of a viable fetus. See, 20-16-701(1). The Court in Margaret S. v. Edwards, supra, appears to focus upon what it perceives to be the "commonly understood" meaning of the term "abortion," notwithstanding its statement that the "morning after pill" constitutes a "deliberate [attempt] to terminate pregnancy after fertilization but before implantation." Id. It should be noted, however, that current medical authority also recognizes the contraceptive quality of the "morning after pill." While it has been stated that "[t]he mechanism for this `morning after' technique remains to be determined, (L. Speroff, R. Glass, N. Kase, Clinical Gynecologic Endrocrinology Infertility 442 (3rd Ed. 1983), the "morning after pill" can apparently act to prevent ovulation, as well as implantation of the fertilized ovum in the uterine wall.[1] This fact may have significance in connection with the policy statement embodied in Section 2 of Amendment 3. One might contend that use of public funds in payment for the "morning after pill" contravenes the stated policy "to protect the life of every unborn child from conception until birth. . . ." Yet it appears that the pill acts in some instances to prevent conception, rather than to interrupt a pregnancy.
Continued questions surrounding the term "conception" must also be recognized in this regard. The United States Supreme Court stated the following in the seminal case of Roe v. Wade, 410 U.S. 113,161 (1973), in its discussion of the view that life begins at the moment of conception:
 Substantial problems for precise definition of this view are posed, however, by new embryological data purport to indicate that conception is a `process' over time, rather than an event, and by new medical techniques such as menstrual extractions, the `morning-after' pill, implantation of the embryos, artificial insemination, and even artificial wombs.
The Arkansas Supreme Court cited the language above in Arkansas Women's Political Caucus v. Riviere, 283 Ark. 463, 677 S.W.2d 846
(1984), and recognized the dilemma by stating:
 An unborn child cannot exist before life begins, but those trained in the disciplines of law, medicine, philosophy and theology are unable to arrive at a consensus of when life begins.
283 Ark. at 467.
It is thus apparent that continued unanswered questions in this area preclude any conclusive statements with respect to whether use of the "morning after pill" falls within Section 2 of the Amendment, which seeks to protect life "from conception."
Section 3 of the Amendment must, however, also be considered wherein it states that the Amendment "will not affect contraceptives." It may be successfully contended in this regard that the term "contraceptives" includes the "morning-after pill." As previously noted, there is medical authority for the proposition that this pill can act as a contraceptive in preventing ovulation. Thus, to this extent, Section 3 would exempt it from the operation of both Sections 1 and 2.
In light of the dual quality of the "morning after pill," relevant federal case law declining to define this pill as "abortion," and remaining issues surrounding the term "conception," it is my opinion that a court would in all likelihood uphold the expenditure of public funds for the "morning after pill" if faced with a challenge to such expenditure under Constitutional Amendment 3 of 1988.
The foregoing opinion, which I hereby approve, was prepared by Assistant Attorney General Elisabeth A. Walker.
[1] "Large doses of diethylstilbestrol (25-50 mg/d for 5 days) after an isolated exposure are said to be effective in preventing pregnancy; however, if the uptake of estrogen coincides with ovulation or entrance of the ovum into the tube, transport of the ovum through the tube may be markedly accelerated. Under these conditions, fertilization may not take place; or, if fertilization has already occurred, the ovum may reach the endometrial cavity prematurely and may not achieve nidation. If coitus takes place 2-6 days before ovulation, the high doses of estrogen will effectively suppress ovulation. If coitus takes place 4 or more days after ovulation, fertilization would not take place anyway. Obviously, the use of high doses of estrogen probably will protect against pregnancy provided the estrogen is given coincident to the transport of the egg through the uterine tube or long enough before ovulation to effect suppression of ovulation." M. Pernoll R. Benson, Current Obstetric Gynecologic Diagnosis Treatment 594 (6th Ed. 1987).